**EAGLE INDUSTRIES, INC., Defendant Below, Appellant,**

v.

**DeVILBISS HEALTH CARE, INC., Plaintiff Below, Appellee.**

**No. 51, 1997.**

Supreme Court of Delaware.

Submitted: Sept. 16, 1997.
Decided: Nov. 25, 1997.

---

Josy W. Ingersoll, and James P. Hughes, Jr., of Young, Conaway, Stargatt & Taylor, Wilmington; and James D. Fiffer and Lisa S. Simmons (argued), of Wildman, Harrold, Allen & Dixon, Chicago, IL, for Appellant.

Michael F. Duggan, of Warren B. Burt & Associates, Wilmington, for Appellee.

Before VEASEY, C.J., WALSH, HOLLAND, HARTNETT and BERGER, JJ., constituting the Court en Banc.

VEASEY, Chief Justice:

In this appeal we focus on the correctness of the grant of summary judgment in a contract dispute over the interpretation of an indemnification provision. In granting summary judgment, the Court of Chancery found the contract provision to be unambiguous. We disagree and hold that the indemnification provision is ambiguous, thus raising factual issues requiring consideration of extrinsic evidence to determine the intended meaning of the provision in light of the expectations of the contracting parties. We reverse the judgment of the Court of Chancery and remand the case for proceedings consistent with this opinion.

### Facts

Eagle Industries, Inc. ("Eagle") and Homecare Acquisition, Inc. ("Buyer") entered into a Stock Purchase Agreement (the "Agreement") on August 13, 1990. Pursuant to the Agreement, Eagle and its wholly-owned subsidiary, DeVilbiss Holding Compa-

ny, Inc. ("Seller"), transferred substantially all of the stock of DeVilbiss Health Care, Inc. ("DHC") to Buyer on October 5, 1990 (the "Closing Date"). After the Closing Date, Buyer merged into DHC, and DHC succeeded to Buyer's interests and liabilities, including those set forth in the Agreement. DHC then became a wholly-owned subsidiary of Homecare Holdings, Inc. ("Holdings").

Article 10.8 of the Agreement provided that Eagle was responsible for fulfilling Seller's indemnification obligations under the Agreement. At issue in this case is the indemnification provision for product liability under Article 10.1 of the Agreement, which reads as follows:

> (b) In addition to and without limiting any other rights or remedies of Holdings and Buyer, Seller shall indemnify Holdings and Buyer and its subsidiaries (including the Companies), and their respective officers, directors, agents and employees, and hold them harmless at all times from and after the Closing Date against and in respect of any and all Damages (i) resulting from any suit, action, arbitration or legal, administrative, governmental or other proceeding or investigation, foreign or domestic, relating to any product manufactured, purchased or sold by Parent, Seller, the Companies, or any affiliates or predecessors of Parent, Seller or the Companies prior to the Closing (including such actions or potential actions set forth in Schedule 3.18 hereto), alleging that such product was defective or was negligently or improperly designed, manufactured, packaged or marketed, without regard to when such product is sold or when such Damages accrue or arise *(provided, that such indemnification shall be limited to Damages arising from such suits, actions, arbitrations or other proceedings the alleged basis for which arose or occurred on or prior to the Closing Date);* . . . .

(emphasis added). The emphasized language was added to Article 10.1 after negotiations between the parties concerning Eagle's in-demnification of Buyer for product liability claims.

Buyer's initial offer dated July 9, 1990 proposed that Eagle indemnify Buyer for product liability claims involving goods manufactured or purchased by Eagle prior to the Closing Date. This proposal was reflected in the indemnification provision contained in the first draft of the Agreement. According to an affidavit submitted by Eagle's then-counsel, Bruce C. Strohm, Eagle objected to a manufacture or purchase date trigger to its indemnification obligation. At a meeting held on July 20, 1990, Strohm informed Buyer that Eagle's product liability insurance coverage was limited to suits based on alleged occurrences prior to the Closing Date. Accordingly, Eagle was not willing to indemnify Buyer for claims based on post-closing occurrences, and Buyer would have to obtain its own insurance to protect against such claims. After the July 20 meeting, the parties redrafted the indemnification provision to include the emphasized proviso.

### Proceedings in the Court of Chancery

The parties disagreed concerning the proper interpretation of the final indemnification provision as it was to apply to product liability claims. DHC filed suit in the Court of Chancery seeking construction and reformation of the indemnification language in Article 10.1(b)(i) so that it provided the date on which the product was manufactured or purchased as a clear reference for determining Eagle's indemnification obligations. Eagle filed a counterclaim for reimbursement of expenditures made in connection with product liability claims, arguing that the parties had intended the date on which the product caused injury to be the triggering event for indemnification under the Agreement.

The parties then filed cross-motions for summary judgment. The Court of Chancery held that the indemnification provision unambiguously set forth the product's manufacture or purchase date as the trigger for Eagle's indemnification obligations and granted DHC's motion for summary judgment.[1] We recite here excerpts from the

---

1. *DeVilbiss Health Care, Inc. v. Eagle Indus., Inc.,* Del.Ch., C.A. No. 14189, 1996 WL 757096 (Jan. 22, 1997) (Mem.Op.).

Memorandum Opinion of the Court of Chancery:

> The parties are now faced with product liability claims, Damages for which may be covered by the terms of the Agreement. Because they are unable to agree on the proper interpretation of the above indemnification provision, they ask this Court to decide whether Eagle's indemnification obligations are to be determined by reference to the date on which a product causes injury or the date on which the product was manufactured or purchased.
>
> \* \* \* \* \* \*
>
> Thus, the question raised, according to DHC, is whether "the alleged basis for which" applies to the basis of the Damages or the basis of the suits, actions, arbitrations or other proceedings.
>
> \* \* \* \* \* \*
>
> Eagle argues that the indemnification provision in dispute is unambiguous and requires Eagle to indemnify DHC for product liability damages which result from injuries occurring before the Closing date of the stock transfer. . . . Eagle interprets "basis" as referring to the personal or property injury at the heart of a product liability suit.
>
> \* \* \* \* \* \*
>
> I conclude that Eagle's interpretation of the Agreement—an interpretation which does not give meaning to every provision of the contract and an interpretation which is internally inconsistent—is not the interpretation that would have been placed on the contract by a reasonable person in the position of the parties at the time of contracting. . . . I do not find that the Agreement is ambiguous.
>
> \* \* \* \* \* \*
>
> For all these reasons, I find that a reasonable person in the position of the parties—one with knowledge of the businesses and risks of medical products—would conclude that the Agreement intended to force the party with the best ability to prevent the harm to bear the risks associated with the harm. By such an arrangement, the Agreement minimized the overall potential costs of product liability suits by forcing the party with the most control over the prevention of harm to bear the risk of the harm. By minimizing the costs of this risk bearing, the parties maximized the gains generated by the stock sale—gains which the parties could then argue over how to distribute.
>
> The Agreement unambiguously provides that Eagle's indemnification obligations are triggered by reference to the date of product manufacture or purchase. Thus, DHC need not indemnify Eagle for damages arising from Eagle's negligence. I grant summary judgment in favor of plaintiff DHC and deny defendant Eagle's cross-motion for summary judgment.[2]

### *Ambiguity in the Indemnification Provision*

■ The key phrase in controversy is the language providing that indemnification is limited to damages *"arising from such suits . . . or other proceedings, the alleged basis for which arose or occurred on or prior to the Closing Date."* What does this phrase mean? Does it mean that Eagle is responsible for claims arising from products manufactured or purchased before the Closing Date? Or is Eagle responsible only for claims based on injuries occurring before the Closing Date?

We disagree with the Court of Chancery that the indemnification provision is unambiguous. Both parties now claim that the provision unambiguously supports their respective interpretations, but DHC stated in its initial complaint that the language in Article 10.1(b)(i) is reasonably susceptible to at least two possible meanings. We are not bound, and the trial court was not bound, by the parties' present claim that the provision is unambiguous. We determine that question *de novo.*

In our view, the indemnification provision can be read as creating an obligation on Eagle's part to cover damages arising from product defect claims when the allegedly de-

---

2. *Id.* at 3, 8–11, 14–15.

fective product was manufactured or purchased before the Closing Date. Alternatively, an equally reasonable *interpretation of* the indemnification provision would obligate Eagle only as to claims based on personal or property injury that occurred prior to the Closing Date.

The Court of Chancery held that Eagle's interpretation did not give proper effect to other portions of the provision. Specifically, the Court of Chancery determined that Eagle's argument that indemnification obligations occur with reference to the date of the alleged injury ignored the portion of Article 10.1(b)(i) stating that such obligations may be triggered "without regard to when such product is sold," as well as the portion stating that Eagle shall indemnify Buyer with respect to any damages resulting from any action relating to any product manufactured, purchased or sold by Eagle prior to the Closing.[3] Because it found that an interpretation calling for a product manufacture or purchase date trigger made better use of each portion of Article 10.1(b)(i), the Court of Chancery held that the *indemnification provision was unambiguous*. The Court of Chancery also rejected Eagle's interpretation because it found no clear language in the Agreement that would provide for DHC's assumption of liability for claims arising from alleged injuries occurring after the Closing Date.[4]

 Contract terms themselves will be controlling when they establish the parties'

common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language.[5] When the provisions in controversy are fairly susceptible of different interpretations or may have two or more different meanings, there is ambiguity. Then the interpreting court must look beyond the language of the contract to ascertain the parties' intentions.[6] We find in this case that a reasonable third person reading the indemnification provision in Article 10.1(b)(i) would be uncertain whether Eagle's obligations should be determined by reference to the date on which the product caused injury or by reference to the date on which the product was manufactured or purchased. Since the indemnification language in the Agreement is ambiguous, consideration of the relevant evidence is required.

### The Use of Extrinsic Evidence in Contract Interpretation

 If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity.[7] But when there is uncertainty in the meaning and application of contract language, the reviewing court must consider the evidence offered in order to arrive at a proper interpretation of contractual terms.[8] This task may be accomplished by the summary judgment procedure in certain cases where the moving party's record is not *prima facie* rebutted so

---

3. *Id.* at 11–12.

4. *Id.* at 14 (citing *State v. Interstate Amiesite Corp.*, Del.Supr., 297 A.2d 41, 44 (1972)).

5. *Rhone–Poulenc v. American Motorists Ins.*, Del. Supr., 616 A.2d 1192, 1196 (1992).

6. *Id.; Pellaton v. Bank of New York*, Del.Supr., 592 A.2d 473 (1991).

7. *Pellaton*, 592 A.2d at 478; *Citadel Holding Corp. v. Roven*, Del.Supr., 603 A.2d 818 (1992). There may be occasions where it is appropriate for the trial court to consider some undisputed background facts to place the contractual provision in its historical setting without violating this principle. But the trial court must be careful in entertaining background facts to avoid encroach-

ing on the basic principles set forth herein. In *Klair v. Reese*, Del.Supr., 531 A.2d 219 (1987), this Court reversed the Court of Chancery and held that the court should consider extrinsic evidence. Unfortunately, certain language in the Court's opinion is overbroad on the issue of when extrinsic evidence should be considered. *Id.* at 223. To the extent that such language may be read to be broader than, or at variance with, the principles set forth in this opinion, it is disapproved. The *Klair* opinion should be construed narrowly to conform with this opinion.

8. *Pellaton*, 592 A.2d at 478. Contract language is not ambiguous simply because the parties disagree concerning its intended construction. The true test is what a reasonable person in the position of the parties would have thought it meant. *Rhone–Poulenc*, 616 A.2d at 1196.

as to create issues of material fact.[9] If there are issues of material fact, the trial court must resolve those issues as the trier of fact.

■ In construing an ambiguous contractual provision, a court may consider evidence of prior agreements and communications of the parties as well as trade usage or course of dealing.[10] In the instant case, Eagle presented the affidavit of Bruce Strohm to the effect that the parties had contracted for an occurrence date trigger to the indemnification provision in a manner consistent with its position. This affidavit, along with its attached exhibits containing correspondence between the parties, drafts of the Agreement and drafting session notes, provide insight into the type of risk allocation that the parties intended the Agreement to reflect. The Strohm affidavit relates to the circumstances that existed at the time the parties drafted the agreement and sets forth evidence that may show that the indemnification clause was designed to conform to Eagle's existing coverage as well as to the future coverage that Buyer expected to obtain.[11] Understandably, Eagle's willingness to indemnify Buyer was constrained by its own insurance liability coverage.

Because of the view of the Court of Chancery that the language in question was unambiguous, this evidence was not properly analyzed and the proceeding was truncated, we believe erroneously. On remand, the Court of Chancery should consider any admissible extrinsic evidence that may shed light on the expectations of the parties at the time they entered into the Agreement.

### Conclusion

■ In a perfect world, integrated contracts would always reflect plainly and accurately the compromises and allocation of risk that the parties intend. The reality is that the contractual language defining rights and obligations of the parties is sometimes ambiguous. It is a court's duty to preserve to the extent feasible the expectations that form the basis of a contractual relationship.

9. Rule 56 of the Rules of the Court of Chancery sets forth the procedure. The portions of that rule relevant here are as follows:

> **Rule 56. Summary judgment.**
> (a) ... A party ... may ... move with or without supporting affidavits for a summary judgment....
>
> \* \* \* \* \* \*
>
> (c) ... The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.
>
> \* \* \* \* \* \*
>
> (e) ... When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

See Continental Airlines v. American General, Del. Supr., 575 A.2d 1160, 1164 n. 5, cert. dismissed, 498 U.S. 953, 111 S.Ct. 376, 112 L.Ed.2d 390 (1990) ("We note that the general rule is that cross-motions for summary judgment do not obligate the Court to render summary judgment, rather the trial court's duty is to determine independently whether there are any genuine issues of material fact.").

10. This is true notwithstanding the presence of a routine integration clause, an example of which is contained in Article 11.4 of the contract at issue here. That provision states in effect that the writing is to "set forth the entire understanding of the parties" so that "[a]ny and all prior or collateral representations, promises and conditions in connection with the subject matter hereof and any representation, promise or condition not incorporated herein or made a part hereof shall not be binding upon any party."

11. See Cities Service Co. v. Gardinier, Inc., Del.Super., 344 A.2d 254, 259, appeal dismissed, 349 A.2d 744 (1975) (holding that evidence of one party's knowledge of the meaning ascribed to contract language by the other contracting party was also relevant to a proper interpretation of the contract). DHC offered evidence of Eagle's behavior after the Closing Date to support DHC's interpretation of the indemnification provision. Setting aside the issue of validity, which Eagle contests, this evidence threatens to transgress one of the primary tenets of the parol evidence rule: relevant extrinsic evidence is that which reveals the parties' intent at the time they entered into the contract. In this respect, backward-looking evidence gathered after the time of contracting is not usually helpful. Demetree v. Commonwealth Trust Co., Del.Ch., C.A. No. 14354, Allen, C., 1996 WL 494910 (Aug. 27, 1996) (Mem.Op.).

When, as in the instant case, the meaning and application of contract terms are uncertain, a court fulfills this duty by considering extrinsic evidence.

Accordingly, we reverse the decision of the Court of Chancery and remand for proceedings consistent with this opinion.