**FINA, INC., f/k/a American Petrofina, Inc. and Fina Oil and Chemical Company, f/k/a American Petrofina Company of Texas**

v.

**ARCO, BP Oil Company, and Sohio Pipeline Company.**

**Civil Action No. 1:96CV393.**

United States District Court, E.D. Texas, Beaumont Division.

July 30, 1998.

---

**25.** The court denies the FDIC's January 15, 1998 motion for protective order as moot.

Elizabeth Ellen Mack, Frederick W. Addison, III, Locke Purnell Rain Harrell, Dallas, TX, for Fina Inc. f/k/a American Petrofina Inc. and Fina Oil & Chemical Co. f/k/a American Petrofina Co. of Texas.

Gilbert Irvine Low, D. Allan Jones, Orgain Bell & Tucker, Beaumont, TX, for ARCO.

John Rolfe Eldridge, Rudy Alan England, Bradley I. Raffle, Hutcheson & Grundy, Houston, TX, John Rolfe Eldridge, Jeffrey C. Hembree, Haynes and Boone LLP, Houston, TX, for BP Oil Company and Sohio Pipe Line Co.

### MEMORANDUM OPINION

HEARTFIELD, District Judge.

Pending before the court are motions to dismiss and for summary judgment filed by plaintiffs and defendants.[1] This memorandum opinion addresses the issues raised in all of the pending motions before the court, specifically: (1) the indemnity agreements between plaintiff and defendants and those between the defendants, (2) choice of law and interpretation of the standard under which liability is to be addressed, and (3) accrual of a CERCLA cause of action.[2]

### Factual Background and Procedural History

During the 1920's, ARCO constructed a refinery facility in Port Arthur, Texas. In 1968 the facility was sold by ARCO to BP and Sohio. In May 1973, BP Oil Company entered into an Agreement for Sale of Assets with Fina, Inc. under the terms of which BP sold the refinery facility to Fina.[3] The agreement expressly provided that it is binding upon the parties and their respective successors and assigns, thus the agreement is, binding upon Fina Oil and Chemical Company as Fina's successor in interest.[4]

The 1973 agreement contained an indemnity clause that is at the heart of this case—whether or not CERCLA liability attaches to conduct that occurred prior to the sale of the facility; when the cause of action "accrued;" and whether the cause of action for recovery can be brought more than 20 years later, despite the express language of the indemnity agreement. Interestingly, the prior agreement between BP and ARCO contained virtually identical indemnity language, which raises the issue of "circuitous indemnity obligations."[5] ARCO and BP have stipulated

1. The following motions are pending before the court as of the date of this Memorandum Opinion: (1) Plaintiff's Motion for Summary Judgment on the Issue of CERCLA Liability (Doc 78 and 79); (2) Defendant ARCO's Motion for Summary Judgment as to cross-claim against BP (Doc 56); (3) Defendant BP and Sohio's Motion for Summary Judgment (Doc 55 and 80) and joinder in the motion by defendant ARCO (Doc 82); (4) Defendant BP and Sohio's Partial Motion to Dismiss (Doc 52 and 73); and (5) Defendant ARCO's Partial Motion to Dismiss (Doc 53 and 74).

2. The court does not address the issues of statute of limitations and CERCLA liability, raised by the parties in their various motions and briefs. There are factual issues in dispute as to whether, or when, any removal or remedial actions occurred and what activities on the part of plaintiff constitutes removal or remedial actions as they impart limitations questions. Likewise there are factual issues in dispute as to whether a "release" occurred at the facility, one of the elements required to attach liability for a CERCLA claim.

3. Although the maps and plats attached to the contract identify separate pieces or units that constituted the facility, it was sold as a whole, not as separate units of production.

4. At the time of the BP/Fina sale in 1973, Fina's predecessor, American Petrofina, Inc. conveyed the facility to Amdel, Inc. and Amdel Pipeline, Inc. Then, in 1977 the Amdel companies conveyed the plant to the predecessor of Fina Oil and Chemical Company, American Petrofina Company of Texas.

5. Such obligations have been held to extinguish plaintiff's cause of action. *See, e.g., Starcraft Co. v. C.J. Heck Co. of Texas, Inc.,* 748 F.2d 982, 989

that BP is the successor in interest to ARCO, and that any obligation to Indemnify ARCO belongs to BP, pursuant to the agreement between BP and ARCO.[6]

Fina contends that in 1990, almost 17 years after the purchase of the facility, it conducted an environmental site assessment and discovered areas in the facility where hazardous wastes were generated, treated, stored, or disposed of, causing Fina to incur response costs under CERCLA and to perform certain corrective actions and further investigations. Fina contends that the hazardous conditions were generated during the respective ownerships of ARCO, BP, and Sohio. The defendants contend that liability for the hazardous conditions, if any, is nullified by the indemnity agreements in the contracts for sale, specifically as between ARCO and BP, and later between BP and Fina. Defendants further contend that plaintiff knew or should have known of the waste management practices of the refinery, and of the areas of the refinery which plaintiff claims to have later discovered were hazardous waste areas at the time that the refinery facility was purchased, or at the very latest, at least nine years prior to bringing this lawsuit.[7] Fina seeks to recover costs of environmental clean-up under state and federal law, and brings this cause of action under several statutes, including: the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA); the Resource Conservation Recovery Act (RCRA); the Texas Solid Waste Act (TSWDA); and the Texas Water Code (TWC).

### *Summary Judgment Standard*

Summary judgment is to be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is

no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). "The mere existence of a factual dispute does not by itself preclude the granting of a summary judgment. '[T]he requirement is that there be no genuine issue of material fact.'" *St. Amant v. Benoit*, 806 F.2d 1294, 1296 (5th Cir.1987) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). A factual dispute is "material" if "its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Texas Manufactured Hous. Ass'n. Inc. v. City of Nederland*, 101 F.3d 1095, 1099 (5th Cir.1996), *cert. denied*, —— U.S., ——, 117 S.Ct. 2497, 138 L.Ed.2d 1003 (1997). "There is no genuine issue of material fact if the evidence is such that, drawing all reasonable inferences in favor of the nonmovant ... a reasonable jury could not return a verdict in his favor." *Atkinson v. Denton Pub. Co.*, 84 F.3d 144, 148 (5th Cir.1996). The movant carries, the burden of showing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "After the movant has presented a properly supported motion for summary judgment, the burden shifts to the nonmoving party to show with 'significant probative evidence' that there exists a genuine issue of material fact." *Texas Manufactured Housing Ass'n*, *supra* at 1099 (quoting *Conkling v. Turner*, 18 F.3d 1285, 1295 (5th Cir.1994)).

### *Discussion*

### 1. Indemnity Agreements

### a. *In General and in the CERCLA Context*

Defendants argue that the following portion of the 1973 sales agreement between BP,

---

(5th Cir.1984), *citing Phillips Pipe Line Co. v. McKown*, 580 S.W.2d 435, 440 (Tex.Civ.App.—Tyler 1979, *writ ref'd n.r.e.*); *Panhandle Gravel Co. v. Wilson*, 248 S.W.2d 779, 785 (Tex.Civ. App.—Amarillo 1952, *no writ*).

**6.** Stipulation filed of record June 9, 1997.

**7.** Defendants refer to the attachments to the contract for sale, which included various maps and plats of the refinery facility, one of which depicted the areas in question as "sludge basins." At

least two Fina employees testified by deposition that these areas were known as waste or sludge dumps dating back to at least 1955, and particularly in the 1970's after Fina purchased the facility. Defendants also refer to letters sent in 1989 by Fina's Senior Attorney, Jim Veach, to an in-house attorney for BP which specifically referred to the alleged contamination at the refinery facility and Fina's reports to the Texas Water Commission relating to the contamination Fina had discovered.

Sohio (SPL) and American Petrofina, precludes Fina from recovering clean-up costs:

> Fina shall indemnify, defend and hold harmless BP and SPL against all claims, actions, demands, losses or liabilities arising from the use or the operation of the Assets or arising under or relating to any lease, contract, license or other agreement assigned to or assumed by Fina or a subsidiary of Fina and accruing from and after closing.

According to defendants, Fina's claims come within this language because the statutes under which they arise, CERCLA, RCRA, TSWDA and TWC, were all enacted subsequent to the consummation of the 1973 sales agreement. This contention rests on the belief that the term "accrue," the root of "accruing," refers to the time when a legal right comes into existence. Fina responds that "accrue" means "complet[ion] of the factual predicates or actions leading to subsequent liability." Under this reading, the misconduct for which Fina seeks remuneration, having occurred before 1973, may be a target of a cost recovery action.

Defendants seem willing, at least for the sake of their argument for summary judgment, to make two concessions. First, they accept that pre-enactment conduct is covered by the CERCLA, RCRA, TSWDA and TWC provisions under which Fina sues.[8] Second, they stipulate that they qualify as successor corporations, as that concept is understood in the CERCLA context. *See United States v. Lang*, 864 F.Supp. 610, 612–13 (E.D.Tex. 1994) (CERCLA case). They implicitly assume that CERCLA's successor liability rule extends to claims brought under the RCRA, TSWDA and TWC.

■ While CERCLA does not permit the avoidance of liability vis-a-vis the government, CERCLA specifically recognizes the enforceability of indemnification agreements which allocate environmental liability among responsible parties. A party may also contract to indemnify another for environmental liability even though CERCLA was not in existence at the time of contracting. *Joslyn Manufacturing Co. v. Koppers Company, Inc.*, 40 F.3d 750 (5th Cir.1994), *citing Kerr–McGee Chem. Corp. v. Lefton Iron & Metal Co.*, 14 F.3d 321, 327 (7th Cir.1994). In *Joslyn*, the Fifth Circuit held that the broad language of the indemnification agreement evinced a strong intent by the parties for indemnification for all liability arising in connection with the occupancy or use of the contracted for property. *Joslyn*, at 754. The indemnification agreement was intended to cover all forms of liability, including liability arising under CERCLA, even though environmental liability under CERCLA was not specifically contemplated at the time of contracting. *Id.* at 754–55.[9]

### b. Express Negligence and Express Strict Liability

■ The "express negligence" and "express strict liability" doctrines are inapplicable to the indemnity provisions in both the ARCO/BP indemnity provision and the BP/Fina indemnity provision. The "express negligence" rule states that contract provisions purporting to indemnify the indemnitee against its own negligence are enforceable, so long as the intent is expressed in specific terms within the contract's four corners *Ethyl Corp. v. Daniel Constr.*, 725 S.W.2d 705 (Tex.1987). This rule has been extended to indemnification clauses purporting to indemnify the indemnitee against its own strict

---

**8.** *See U.S. v. Olin Corp.*, 107 F.3d 1506, 1511–15 (11th Cir.1997) (discussing CERCLA); *Wagner Seed Co. v. Bush*, 946 F.2d 918, 929 n. 4 (D.C.Cir. 1991) (discussing CERCLA and SARA), *cert. denied*, 503 U.S. 970, 112 S.Ct. 1584, 118 L.Ed.2d 304 (1992); *Tanglewood E. Homeowners v. Charles–Thomas, Inc.*, 849 F.2d 1568, 1575–76 (5th Cir.1988) (discussing 42 U.S.C. § 6972(1)(B) (RCRA)); *Hicks v. Humble Oil and Refining Co.*, 970 S.W.2d 90, 93–94 (Tex.App.—Houston [14th Dist.] May 14, 1998, n.w.h.) (slip opinion) (negligence per se claim against party for polluting land before Texas Water Code was enacted fails

because Texas Water Code only applies prospectively). *Compare* TEX HEALTH & SAFETY CODE ANN. §§ 361.344–.345 (West 1992 & Supp.1998) (TSWDA cost recovery provisions) *with Hicks*, 970 S.W.2d 90, 93–94 (presumption of prospectivity attaches to Texas statutes).

**9.** The indemnification agreements in *Joslyn* were quite lengthy and specific as to certain types of occurrences; however, much of the language is identical to the agreement at issue in this case.

liability. *Houston Lighting and Power Co. v. Atchison, Topeka, & Santa Fe R.R. Co.*, 890 S.W.2d 455 (Tex.1994). This rule is applied to ensure that indemnitors do not become liable for unexpected liabilities. This doctrine is inapplicable in this case because it is generally applied only in cases where the parties enter into an indemnity agreement which attempts to relieve a party of it liability *in advance for future actions*. *Dresser Industries, Inc. v. Page Petroleum Inc.*, 853 S.W.2d 505, 507 (Tex.1993) (emphasis added). In *Dresser*, the court applied the "fair notice requirement" to indemnity agreements and releases only when such exculpatory agreements were utilized to relieve a party of liability for its own negligence *in advance*. *Id.* at 508 (emphasis added). Two years later, the Texas Supreme Court emphasized that the holding in *Dresser* was explicitly limited to releases and indemnity clauses in which one party exculpates itself from its own future negligence. *Green Int'l Inc. v. Solis*, 951 S.W.2d 384, 387 (Tex.1996).[10]

■ In this case, the indemnity provisions did not purport to apply to future acts, but divided the liability between the parties as of the date of closing—the defendants to be responsible for liability accruing before closing and plaintiff being responsible for that which accrued after closing. The parties clearly established a "bright line" for the transfer of all rights, duties, and obligations, including liabilities. The indemnity agreements were provisions of sales agreements, which were carefully drafted by sophisticated businessmen, international oil companies, and corporate attorneys. The parties were familiar with the custom and practices of the industry and bargained for and agreed to the terms of the indemnity provisions. Experience of the parties is a factor to be considered in determining whether exculpatory provisions should be enforced. *Green, supra* at 387. In this context, the intent of the parties is clear, and application of express negligence and express strict liability doctrines would serve to invalidate the intent of the parties.

## 2. Choice–of–Law

### a. As Affecting Indemnity Agreements

■ A party can agree to indemnify another for liability based on activity occurring prior to enactment of CERCLA.[11] *See Joslyn, supra*. It can do so through a contract that "is either specific enough to include CERCLA liability or general enough to include any and all environmental liability which would, naturally, include subsequent CERCLA claims." *Aluminum Co. of Am. v. Beazer E., Inc.*, 124 F.3d 551, 565 (3d Cir. 1997). State law resolves disputes over whether or not a contract's indemnification provision evinces either characteristic, unless its application conflicts with CERCLA or one of its objectives. *See Fisher Dev. Co. v. Boise Cascade Corp.*, 37 F.3d 104, 108–09 (3d Cir.1994). The choice-of-law rules of the state in which suit has been brought establish which state's law governs. *See Landry v. A–Able Bonding, Inc.*, 75 F.3d 200, 205 n. 7 (5th Cir.1996). If the applicable state law fails to resolve the interpretive issue at hand, then the court must, as prescribed by *Erie Railway*,[12] predict how the state's supreme court would rule. *See Federal Dep. Ins. Corp. v. Abraham*, 137 F.3d 264, 268 (5th Cir.1998). The court must base its forecast on (1) lower state court decisions, (2) dicta by the state's supreme court, (3) the general rule on the question, (4) the rulings of courts

---

**10.** Other jurisdictions have adopted the express negligence doctrine or its equivalent. *See, e.g., Inland Oil and Transport Co. v. City of Mount Vernon*, 624 F.Supp. 122, 126 (S.D.Ind.1985) (parties may lawfully bind themselves to indemnity against future acts of negligence, whether it be the negligence of the indemnitor or the indemnitee, if they have an express contract); *Industrial Risk Insurers v. International Design & Mfg., Inc.*, 884 S.W.2d 432, 434 (Mo.Ct.App. 1994) (under Missouri law, parties may contract to indemnify for future acts if the contracts clearly indicates); *Olsen v. Breeze, Inc.*, 48 Cal.

App.4th 608, 622, 55 Cal.Rptr.2d 818 (Cal.Ct. App.1996) (under California law, in order to exculpate a tortfeasor from future liability, a release must be clear, unambiguous, and explicit).

**11.** The BP defendants imply that their argument, while rooted in CERCLA caselaw, should reach claims brought under the RCRA, TSWDa and TWC.

**12.** *Erie Railway v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

of other states to which the state's courts look when formulating substantive law, and (5) other available sources, such as legal commentaries. Absent evidence to the contrary, it presumes that the state's supreme court would adopt the prevailing rule if called upon to do so. *See Jackson v. Johns–Manville Sales Corp.,* 781 F.2d 394, 397–98 (5th Cir.) (en banc), *cert. denied,* 478 U.S. 1022, 106 S.Ct. 3339, 92 L.Ed.2d 743 (1986).

■■■■ Texas' choice-of-law rules determine under which state's law structures analysis of the sales contract. *See Landry, supra.* In Texas, the law of the state with the most significant relationship to the particular substantive issue is applied, except in those contract cases in which the parties have agreed to a valid choice-of-law clause. *See Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414, 421 (Tex.1984). A choice-of-law clause is valid "unless (1) the contract bears no reasonable relation to the chosen state or (2) the law of the chosen state violates a fundamental public policy of Texas." *Exxon Corp. v. Burglin,* 4 F.3d 1294, 1298 (5th Cir.1993) (citing *DeSantis v. Wackenhut Corp.,* 793 S.W.2d 670, 677 (Tex.1990), *cert. denied,* 498 U.S. 1048, 111 S.Ct. 755, 112 L.Ed.2d 775 (1991)). "In analyzing whether a fundamental policy is offended ..., the focus is on whether the law in question is part of state policy so fundamental that the courts of the state will refuse to enforce an agreement contrary to that law, despite the parties' original intentions, and even though the agreement would be enforceable in another state connected with the transaction." *DeSantis,* 793 S.W.2d at 680. "[A]pplication of the law of another state is not contrary to

fundamental policy of the forum merely because it leads to a different result than would obtain under the forum's law." *Id.*

The 1973 sales agreement between BP and Fina calls for it to be "construed and governed under the laws of the State of Delaware." If this choice-of-law provision satisfies Texas' test for validity, then Delaware law governs disposition of the dispute between the BP defendants and Fina. If it fails to do so, then Texas law applies and the analysis of the contract mirrors that of the earlier sales agreement between BP, SPL and ARCO.[13]

■■■■ Delaware courts interpret contracts as a whole. *Gertrude L.Q. v. Stephen P.Q.,* 466 A.2d 1213, 1217 (Del.1983). All provisions are given effect, and a construction rendering any provision illusory or meaningless is avoided. *See Seabreak Homeowners Ass'n, Inc. v. Gresser,* 517 A.2d 263, 268 (Del.Ch.1986), *aff'd,* 538 A.2d 1113 (Del.1988); *see also Sonitrol Holding Co. v. Marceau Investissements,* 607 A.2d 1177, 1184 (Del.1992) ("The cardinal rule of contract construction is that, where possible, a court should give effect to all contract provisions."). In other words, the court must "consider the entire instrument and attempt to reconcile all of its provisions 'in order to determine the meaning intended to be given to any portion of it.'" *Wood v. Coastal States Gas Corp.,* 401 A.2d 932, 937 (Del. 1979).

■■■■ Delaware courts assign contractual language its plain and ordinary meaning.[14] *Gertrude L.Q.,* 466 A.2d at 1217. Un-

---

**13.** The choice-of-law provision may possess validity. First, it bears a reasonable relation if BP and SPL were Delaware corporations. (The BP defendants are Delaware corporations.) *See Stuart v. Spademan,* 772 F.2d 1185, 1195 (5th Cir.1985) ("The domicile of a party may well provide sufficient connection with the transaction under Texas law, even in the absence of other contacts, to validate an express choice of the domicile's law."); *State Nat'l Bank v. Academia, Inc.,* 802 S.W.2d 282, 290 (Tex.App.—Corpus Christi 1990, *writ denied*) (residency of plaintiff one circumstance showing reasonable relationship between the contract and chosen state). Second, nothing suggests that the relevant Delaware law contravenes any fundamental policy of Texas. *See* Pls.' Resp. BP Defs.' Mot.

Summ.J. at 9 & nn. 11, 20. *Compare* Tex. Health & Safety Code Ann. § 361.002 (West 1992 & Supp. 1998) *with* Del.Code Ann Conservation §§ 6301, 6401, 7901 (1997). *Compare infra* nn. 4–6, 8, 10 *with Union Carbide Corp. v. Thiokol Corp.,* 890 F.Supp. 1035, 1046–47 (S.D.Ga.1994) *and Maxus Exploration Corp. v. Moran Bros., Inc.,* 817 S.W.2d 50, 56–57 (Tex.1991).

**14.** Delaware courts refer to the dictionary to define the plain, ordinary meaning of a contractual term or phrase. *See Northwestern Nat'l Ins. Co. v. Esmark, Inc.,* 672 A.2d 41, 44 (Del.1996); *Vitalink Pharm. Servs., Inc. v. Grancare, Inc.,* No. 15744, 1997 WL 458494 (Del.Ch. Aug. 7, 1997), *cf. Fisher v. Novak,* Civ. A. No. 88C–MY–21,

less a contract evinces ambiguity, its plain meaning controls. *See Eagle Indus., Inc. v. De Vilbiss Health Care, Inc.,* 702 A.2d 1228, 1232 (Del.1997). In this situation, "extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the parties, or to create ambiguity." *Id.* However, "[t]here may be occasions were it is appropriate for the ... court to consider some undisputed background facts to place the contractual provision in its historical setting without violating this principle." *Id.* n. 7

■ A contract evinces ambiguity "only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Rhone–Poulenc v. American Motorists, Inc.,* 616 A.2d 1192, 1196 (Del.1992). Ambiguity fails to pervade "where the court can determine the meaning of a contract 'without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends.' " *Id.* A court must refrain from "tortur[ing] contractual terms to impart ambiguity where ordinary meaning leaves no room for uncertainty. The true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it to mean." *Id.*

■ The parol evidence rule governs reliance on extrinsic evidence to discern an ambiguous contract's meaning.[15] *See Pellaton v. Bank of N.Y.,* 592 A.2d 473, 478 (Del.1991); *see also Citadel Holding Corp. v. Roven,* 603

A.2d 818, 822 (Del.1992) ("Only when there are ambiguities may a court look to collateral circumstances."). Under that principle of contract law, "relevant extrinsic evidence is that which reveals the parties' intent at the time they entered into the contract." *Eagle Indus.,* 702 A.2d at 1233 n. 10. So "backward-looking evidence gathered after the time of contracting is not usually helpful." *Id.*

■ Application of Delaware law sustains the BP defendants' interpretation of the Fina indemnity provision. The Fina indemnity provision's unambiguous terms are broad enough to encompass CERCLA claims against BP and its successors.

#### b. As Affecting Liability Under CERCLA

■ Fina maintains that the BP defendants may receive no recovery because the indemnity provision fails to satisfy the clear and unequivocal rule, which Delaware follows. The rule enables a party to secure indemnification for its own negligence only via "crystal clear and unequivocal" contractual language (clear and unequivocal rule).[16] *See State v. Interstate Amiesite Corp.,* 297 A.2d 41, 44 (Del.1972). Fina posits that the rule should extend to misconduct for which a party is strictly liable, such as that covered by CERCLA. *Compare* Resp at 13–14 *with In re Bell Petroleum Servs., Inc.,* 3 F.3d 889, 897 (5th Cir.1993).

■ This, argument proves unavailing, even if the clear and unequivocal rule reaches the strict liability context. Although Dela-

1990 WL 82159, at *3 (Del.Super. June 11, 1990) (differing, plausible dictionary meanings establish existence of ambiguous language), *aff'd,* 599 A.2d 414 (Del.1991).

15. Delaware's parol evidence rule, as a substantive legal principle, must be applied. *See Jack H. Brown & Co. v. Toys "R" Us, Inc.,* 906 F.2d 169, 173 (5th Cir.1990) and *Conway v. Chemical Leaman Tank Lines, Inc.,* 540 F.2d 837, 839 (5th Cir.1976) (quoting 9 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2405 (1971)).

16. The Texas Supreme Court has rejected the clear and unequivocal rule in favor of the express negligence rule. *See Ethyl Corp., supra* at 708. The express negligence rule is "a more rigorous standard." Clark C. Johnson, *Collapsing the Le-*

*gal Impediments to Indemnification,* 69 Ind.L.J. 867, 888 (1994). Under it, "the parties seeking to indemnify the indemnitee from the consequences of its own negligence must express that intent in specific terms ... within the four corners of the contract." *Ethyl.* The clear and unequivocal rule, in contrast, requires no explicit statement of an intention to indemnify the indemnitee against his or her own negligence. *See Downey v. Sanders,* No. Civ. A. 93C–02–005, 1996 WL 190775, at *2 (Del.Super. Mar. 22, 1996) (*citing Rock v. Delaware Elec. Cooperative, Inc.,* 328 A.2d 449, 454 (Del.Super.1974) ("While the intention to indemnify against the results of the indemnitees' negligence must be clear, it need not be expressed in so many words.")); *James v. Getty Oil Co. (E.Operations),* 472 A.2d 33, 37 (Del.Super.1983); *see also Kreider v. F. Schumacher Co.,* 816 F.Supp. 957, 962 (D.Del.1993).

ware courts have never expressly done so, they would recognize the clear and unequivocal rule as limited to future acts, given the apparently wide recognition of such a temporal constraint.[17] *Compare* 41 Am.Jur.2d *Indemnity* § 8 (1995 & Supp.1997) ("a contract may validly provide for the indemnification of one against, or relieve him from liability for, his own future actions of negligence as long as the indemnity against the results of the negligence is unequivocally clear in the contract") *and* 57A Am.Jur. *Negligence* § 51 (1989 & Supp.1997) ("it is now the prevailing rule that a contract may validly provide for the indemnification of one against, or relieve him from liability for, his own future acts of negligence, provided the indemnity against such negligence is made unequivally clear in the contract") *with Johns–Manville*, 781 F.2d at 397–98.[18] This limitation of the clear and unequivocal rule to prospective activity results in BP's operation of the plant, prior to the closing of the 1973 sales agreement, falling outside of the rule's reach.[19]

### 3. Accrual of Cause of Action under CERCLA

The BP defendants' conception of "$ccrue" comports with that term's plain, ordinary meaning: "to come into existence as an enforceable claim," *Webster's New Third International Dictionary* 13 (1967) [hereinafter *Webster's]* (def.1); *accord Random House Unabridged Dictionary* 13 (2d ed.1993) [hereinafter *Random House* ] ("to become a present and enforceable right or demand"), *see also Black's Law Dictionary* 20–21 (6th ed.1990) [hereinafter *Black's* ] ("to arise, to happen, to come into force or existence; to vest . . .") ("A cause of action 'accrues' when a suit may be maintained thereon. . . ."). This circumstance establishes the

Fina indemnity provision as placing on Fina responsibility for indemnifying BP for "all" future claims. Causes of action under CERCLA qualify as future claims because CERCLA was enacted in 1980, *see United States v. Bestfoods*, —— U.S. ——, ——, 118 S.Ct. 1876, 1881–82, 141 L.Ed.2d 43, No. 97–454, 1998 WL 292076, at *3 (1998), after the 1973 sales agreement between BP and Fina was executed. *See FMC Corp. v. Northern Pump Co.*, 668 F.Supp. 1285, 1292 (D.Minn. 1987), *appeal dismissed*, 871 F.2d 1091 (8th Cir.1988).

Fina contends that the BP defendants' reading of "accrue" renders meaningless the indemnity provision in the 1973 sales agreement. Further, Fina contends that the provision, as BP defines "accrued" imposes liability on BP for "all contamination." This argument lacks merit. The BP indemnity provision obligates BP to indemnify Fina for claims that the law (either common or statutory) recognized as viable before the closing of the 1973 sales agreement. Indeed, Fina's negligence claim against the BP defendants illustrates this duty. *See infra* n. 9; *cf.* BP Defs.' Reply Fina's Resp. BP's Mot.Summ.J. at 7 ("if a third party, *e.g.*, an employee or customer of the Refinery, sued Fina based upon a cause of action that accrued prior to closing of the Agreement, *e.g.*, a personal injury or breach of contract claim, BP would be required to indemnify Fina.").

Fina argues that "accrued" evinces ambiguity because of the parties' disagreement over the word's meaning. This circumstance, it contends, permits consideration of facts establishing the correctness of its interpretation of the 1973 sales agreement. The mere dispute between the parties over the definition of "accrue" fails to create ambiguity.[20] The unambiguous language of the Fina in-

---

**17.** No Delaware case involving the clear and unequivocal rule has concerned anything other than future (i.e., post-contract) conduct by the indemnitee.

**18.** The Texas Supreme Court has restricted the express negligence rule to future activity. *See Dresser Indus., Inc. v. Page Petroleum, Inc.*, 853 S.W.2d 505, 507 (Tex.1993).

**19.** The clear and unequivocal rule acquires no relevance as to BP's conduct before closing because it promised to indemnify Fina for all

claims based on conduct accruing prior to that time, which would include those for negligence. *See* W. Page Keeton, *Prosser and Keeton on Torts* § 28 (5th ed.1984) ("negligence took shape as a separate tort during the earlier part of the nineteenth century").

**20.** Texas, like Delaware, ascribes to the principle that a difference-of-opinion between litigants does not spawn ambiguity. *See Columbia Gas Transmission*, 940 S.W.2d at 589.

demnity provision, indeed, settles that word's meaning. *See Rhone–Poulenc*, 616 A.2d at 1196. As such, no resort to parol evidence, which is what Fina offers to bolster its position, may occur.[21] *See Citadel Holding*, 603 A.2d at 823.

Fina's conception of "accrue," unlike that of the BP defendants, clashes with the imperative to give effect to all contract provisions. Its construes "accrue" as synonymous with "accrued," *see* Resp. at 16 (citing *North Shore Gas Co. v. Salomon*, Inc., 963 F.Supp. 694, 701 n. 4 (N.D.Ill.1997)) (discussing phrase "accrued or existing"), which means, among other things, "occurred," *Black's, supra.* That reading makes the provision of the 1973 sales agreement, in which BP promises to indemnify Fina, meaningless.

If "accrue," as Fina sees it, refers to all conduct by BP prior to the closing in 1973, regardless of legal actionability at that time, then the modifying phrase "prior to Closing and arising from the use or operation of the Assets" becomes unnecessary. *See Seabreak*, 517 A.2d at 268. Likewise, Fina's conception of "accrue" makes the Fina indemnity provision redundant. Applying its interpretation to that section, Fina would only indemnify BP for claims based on conduct by BP "from and after closing." But once closing occurs, BP no longer owns the plant; it cannot "use or operat[e] ... the" plant nor be a party "to any lease, contract, license or other agreement assigned to or assumed by Fina or a subsidiary of Fina." Consequently, BP can never engage in activity subject to a claim that Fina must indemnify. This reading of the Fina indemnity provision simply restates what the BP indemnity provision explicitly and affirmatively declares: BP will assume legal responsibility for all claims based on its activity while plant owner.

 A claim accrues when the holder of that claim has a right to file suit to protect his interest or to recover damages. A party cannot protect an interest it does not have;

thus, a claim relating to real property cannot accrue until the claim holder owns the property and has an interest to protect. *See Ferguson v. Johnston*, 320 S.W.2d 906, 911 (Tex.Civ.App.—Texarkana 1959, *writ ref'd n.r.e.*); *Hensley v. Conway*, 29 S.W.2d 416 (Tex.Civ.App.—Eastland 1930, *no writ* ). In this case, Fins is asserting claims for contribution, which could not have accrued until the underlying demands were made against Fina—many years after the refinery facility was sold to Fina by B.P. Additionally, a cause of action cannot accrue before the statute authorizing the cause of action is enacted. *See Levin Metals Corp. v. Parr–Richmond Terminal Co.*, 817 F.2d 1448 (9th Cir.1987). Both ownership of the property and the passage of the statute authorizing recovery occurred long after closing—the "bright line" which defined and directed the course of liability.

 The unambiguous language of the Fina indemnity provision requires Fina to indemnify the BP defendants for CERCLA and other claims, and likewise the indemnity provision between BP and ARCO require the indemnity to pass through to ARCO as well.

### Conclusion

The indemnity agreements are valid, and limit liability of the BP defendants to those actions which accrued prior to the closing of sale in 1973. BP agreed to indemnify its predecessor in interest, ARCO; therefore, the indemnity becomes a circuitous obligation and passes through from Fina to BP and finally to ARCO. *See* footnote 5, *supra.* Plaintiff's cause of action did not accrue until at least the passage of CERCLA. Even though the parties did not contemplate CERCLA in 1973, the shifting of liabilities through the indemnity agreement is valid and enforceable, whether under Delaware or Texas law, even in the environmental cleanup context of CERCLA actions.

There being no genuine issues of material fact as related to this Memorandum Opinion,

---

21. The significance the extrinsic facts identified by Fina follows from Fina's understanding of "accrue"—that BP must fend for itself as to all claims based on its operation of the plant. Under the BP defendants' interpretation of the Fina

indemnity provision, with which the court agrees, the mere fact that BP chose to defend itself in other litigation is uninformative without evidence of the types of claims it faced.

defendants are entitled to judgment as a matter of law.

An order and final judgment shall be entered in accordance with this Memorandum Opinion.

### ORDER ON MEMORANDUM OPINION

The Defendant's motions for summary judgment (Docs. 55, 56, and 80) are **GRANTED.**

All other motions not previously ruled on, or specifically ruled on by this judgment, are hereby **DENIED.**

The court will enter a separate final judgment in accordance with the Memorandum Opinion and order.