21-2401-cv
*Retail Pipeline, LLC v. Blue Yonder, Inc., et al.*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

## SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 14th day of December, two thousand twenty-two.

Present:
> DEBRA ANN LIVINGSTON,
> *Chief Judge*,
> GUIDO CALABRESI,
> GERARD E. LYNCH,
> *Circuit Judges.*

---

RETAIL PIPELINE, LLC,

> *Plaintiff-Appellant*,

DARRYL LANDVATER,

> *Plaintiff,*

> v.                                                        21-2401-cv

BLUE YONDER, INC., FKA JDA SOFTWARE GROUP, INC., AND BLUE YONDER GROUP, INC.,FKA JDA SOFTWARE, INC.,

> *Defendants-Appellees.*[*]

---

[*] The Clerk of Court is respectfully directed to amend the official caption as set forth above.

For Petitioner-Appellant:     JENNIFER E. MCDONALD (William T. Clark, *on the brief*), Downs Rachlin Martin PLLC, Burlington, VT.

For Respondent-Appellee:     JUSTIN B. BARNARD (Karen McAndrew, *on the brief*), DINSE, P.C., Burlington, VT.

Appeal from a judgment of the United States District Court for the District of Vermont (Reiss, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **AFFIRMED**.

Plaintiff-Appellant Retail Pipeline, LLC appeals from the August 31, 2021 order of the United State District Court for the District of Vermont (Reiss, *J.*), granting the motion for summary judgment of Defendants-Appellees Blue Yonder Group, Inc. and Blue Yonder, Inc. (collectively "JDA").[1]  The proceedings arise from JDA's acquisition of Retail Pipeline's interest in the intellectual property associated with "Flowcasting"—a software product used for supply chain management that was developed by Retail Pipeline's principals, Darryl Landvater and Andre Martin—pursuant to the parties' Membership Interest Purchase Agreement ("MIPA") executed on February 25, 2014.   On appeal, Retail Pipeline argues that the district court erred in dismissing its breach of contract and breach of the implied covenant of good faith and fair dealing claims on summary judgment.[2]   For the following reasons, we **AFFIRM** the order and judgment below. We assume the parties' familiarity with the underlying facts, the procedural history of the case, and the issues on appeal, which we reference here only as necessary to explain our decision.

---

[1]  In 2020, during the pendency of the proceedings below, JDA Software, Inc. and JDA Software Group, Inc. changed their corporate names to Blue Yonder, Inc. and Blue Yonder Group, Inc., respectively.   For consistency with the record and the parties' briefs, Defendants-Appellees are collectively referred to as "JDA" here.

[2]  The district court also granted summary judgment on Retail Pipeline's implied contract claim and on its claim for constructive fraud.   Retail Pipeline does not appeal those portions of the

\* \* \*

"We review a district court's grant of summary judgment *de novo*." *Moreno-Godoy v. Kartagener*, 7 F.4th 78, 84 (2d Cir. 2021).[3] "Summary judgment is properly granted when there is no genuine issue of material fact and one party is entitled to judgment as a matter of law." *Id.* "In assessing the record to determine whether there is a genuine issue to be tried as to any material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Id.*

## I. Breach of Contract Claim

Under the terms of the MIPA, Retail Pipeline agreed to transfer its interest in the Flowcasting intellectual property to JDA in exchange for a guaranteed upfront payment of $3 million, paid in three installments, and up to an additional $7 million in earn-out payment for revenue earned on certain products through December 31, 2018. In particular, the earn-out provision, Section 1.3 of the MIPA, identified three revenue streams that would contribute to Retail Pipeline's compensation: (1) licensing revenue from (a) "Flowcasting 1.0," under existing contracts with a handful of identified customers, (b) JDA's collaborative forecasting and replenishment software, "Collaborative Shelf Planning Analytics" ("CSPA"), and (c) "Flowcasting 2.0 or similar product"; (2) licensing revenue from the "Slow Mover module," that is, the software module implementing Retail Pipeline's valuable slow-moving product algorithm; and (3) licensing revenue in excess of the first $15 million per year on the sale of JDA's own

---

decision and we therefore do not address them.

[3] Unless otherwise indicated, we omit all internal citations, quotation marks, alterations, and footnotes from citations.

3

supply chain management software, Demand and Fulfilment ("D&F") to retail customers. App'x 306.

The agreement provides that Retail Pipeline would begin receiving earn-out payments (12.5% of the first two streams and 4% of the third) once the aggregate revenue from the first and second streams exceeded $10 million. The MIPA also capped aggregate earn-out payments at $7 million and provided JDA with a right of offset for, among other things, capital contributions to the joint venture with Retail Pipeline made by JDA's predecessor-in-interest. At the end of the earn-out period in 2018, the combined revenue from the first two streams (in excess of a $10 million threshold for payments under the MIPA to begin) was $7,842,069.47, thus contributing $980,258.68 to the earn-out (based on the agreed-upon 12.5% rate). There was no contribution from the third revenue stream as sales of D&F to retail customers never exceeded the $15 million annual revenue threshold necessary to trigger that stream's contribution to the earn-out. After an offset of $559,665.93 was applied, JDA made a $420,592.75 payment to Retail Pipeline under the MIPA's earn-out provision.

Retail Pipeline argues that JDA breached its obligations under the MIPA by failing to pay to Retail Pipeline the full compensation due to it under the earn-out—specifically, by failing to create and market a new product (referred to as "Flowcasting 2.0 or similar product" in the MIPA's earn-out provision) thus causing Retail Pipeline to receive less than the full amount of consideration to which it was entitled. Notwithstanding that the MIPA contains no express provision requiring JDA to develop a "Flowcasting 2.0 or similar product" or even use best efforts toward the development of such a product, Retail Pipeline argues that the term "Flowcasting 2.0 or similar product" is ambiguous, necessitating reference to extrinsic evidence to interpret it. Once that extrinsic evidence is considered, Retail Pipeline urges, it becomes evident that the term

4

"'Flowcasting 2.0 or similar product' was intentionally included in the MIPA to reflect a promise from JDA to develop a new product" pursuant to the steps set forth in the "roadmap" email of a JDA employee memorializing a December 16, 2013 meeting with Landvater and Martin regarding ways in which D&F's software could be improved by integrating features from Flowcasting. Appellant's Opening Br. at 11. For the following reasons, we disagree.

"To prevail on a breach of contract claim, a party must prove the existence of a contractual obligation, the breach of that obligation, and resulting damages." *Arwood v. AW Site Servs., LLC*, 2022 WL 705841, at *27 (Del. Ch. Mar. 9, 2022) (citing *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003)).[4] Under Delaware law, "[a]n ambiguity exists 'when the provisions in controversy are fairly susceptible of different interpretations or may have two or more different meanings.'" *Nicholas v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 83 A.3d 731, 735 (Del. 2013) (quoting *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997)). "Where a contract is ambiguous, 'the interpreting court must look beyond the language of the contract to ascertain the parties' intentions'" and consider "extrinsic evidence to arrive at a proper interpretation of contractual terms." *Id.* (quoting *Eagle Indus.*, 702 A.2d at 1232). "[W]here a contract is unambiguous on its face, the parol evidence rule bars the introduction of extrinsic evidence." *In re Viking Pump, Inc.*, 148 A.3d 633, 646–47 (Del. 2016).

Retail Pipeline argues that the term "Flowcasting 2.0 or similar product" is ambiguous because it is not defined in the agreement between the parties, does not have a dictionary definition, is not in common usage, and appears only once in the contract. While Retail Pipeline

---

[4] The MIPA provides that it "will be governed by, and construed in accordance with, the laws of the State of Delaware," App'x 314, and the parties agree that the claims on appeal are governed by Delaware law.

acknowledges that the use of an undefined term does not alone render a contract ambiguous, *see Sassano v. CIBC World Mkts. Corp.*, 948 A.2d 453, 468 n.86 (Del. Ch. 2008), it argues that this is an instance in which "multiple and different interpretations may reasonably be ascribed" to the disputed term,[5] *ConAgra Foods, Inc. v. Lexington Ins. Co.*, 21 A.3d 62, 69 (Del. 2011). The purported ambiguity on which Retail Pipeline relies, however, is simply beside the point.

Even assuming some ambiguity over the scope of the "Flowcasting 2.0 or similar product" language in the MIPA, it does not follow that the Court may rely on extrinsic evidence to infer an affirmative obligation to develop such a product (or to use best efforts to develop such a product) when the contract unambiguously contains no express provision creating such an obligation. The MIPA requires JDA to pay an earn-out based on revenues earned on "Flowcasting 2.0 or similar product." If Retail Pipeline were adequately contending that JDA had failed to make payments based on revenues from a particular product that it believed falls within the meaning of that phrase, we might be required to resolve any ambiguity about its meaning in order to determine whether the product constituted either "Flowcasting 2.0" or a "similar product." Here, however, no such contention is adequately made. Rather, Retail Pipeline essentially alleges that *no* such product was ever created, and that the contract implicitly imposed an obligation on JDA to create one. But resolving a dispute over the *definition* of "Flowcasting 2.0 or similar product" cannot impose an obligation on JDA, found nowhere in the MIPA, to create a product that fits that definition.

---

[5] Specifically, while JDA has read the term capaciously to include everything from a rebranded version of JDA's preexisting CSPA product to undeveloped products incorporating the Flowcasting intellectual property, Retail Pipeline has interpreted the term to refer to something much narrower—namely, a new product converging the technology of Flowcasting with JDA's D&F software in a manner consistent with the "roadmap" allegedly agreed upon during the December 16, 2013 meeting. App'x 650.

6

Although Delaware law, as already noted, permits extrinsic evidence "to resolve a contractual term that is ambiguous," "[t]he parol evidence rule bars evidence of additional terms to a written contract, when that contract is a complete integration of the agreement of the parties." *Peden v. Gray*, 886 A.2d 1278, 1278 (Del. 2005). A written agreement is "totally integrated" when it is intended to be "the final and complete" expression of the parties' agreement. *Carrow v. Arnold*, 2006 WL 3289582, at *4 (Del. Ch. Oct. 31, 2006), *aff'd*, 933 A.2d 1249 (Del. 2007). Retail Pipeline does not dispute that the MIPA constitutes a fully integrated contract. We may not, therefore, supplement the terms of the contract based on alleged antecedent understandings or negotiations in order to create an obligation that does not appear in the MIPA. Accordingly, the district court did not err in granting summary judgment to JDA on Retail Pipeline's breach of contract claim.

## II. Breach of the Implied Covenant of Good Faith and Fair Dealing

In the alternative, Retail Pipeline argues that JDA's failure to develop a "Flowcasting 2.0" product constitutes a breach of the implied covenant of good faith. Under Delaware law, "[t]he implied covenant [of good faith and fair dealing] is inherent in all contracts . . . ." *Dieckman v. Regency GP LP*, 155 A.3d 358, 367 (Del. 2017). The implied covenant "requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain." *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005). The "goal [of the doctrine] is to preserve the economic expectations of the parties" by "ensur[ing] that the parties deal honestly and fairly with each other when addressing gaps in their agreement." *Glaxo Grp. Ltd. v. DRIT LP*, 248 A.3d 911, 919 (Del. 2021).

As the Delaware Supreme Court has explained, absent contractual language to the contrary, a buyer is not generally obligated to operate its business "so as to ensure or maximize the [seller's] earn-out payments." *Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 811 (Del. 2013). However, a breach of the implied covenant may occur when the buyer's conduct demonstrates that it "acted with the intent to deprive the seller of an earn-out payment," *Lazard Tech. Partners, LLC v. Qinetiq N. Am. Operations LLC*, 114 A.3d 193, 196 (Del. 2015), such as by "actively shifting costs into the earn-out period that had no place there," *Winshall*, 76 A.3d at 816. For example, in *American Capital Acquisition Partners, LLC v. LPL Holdings, Inc.*, the Delaware Court of Chancery dismissed an implied covenant claim alleging that the defendants had an implied duty to implement certain previously discussed modifications to their technological systems to aid the plaintiffs in meeting their bonus targets, but held that the plaintiffs had stated an implied covenant claim based on allegations that the defendants "affirmatively act[ed] to gut [the acquired division] to minimize [earn-out] payments," including by "pivot[ing]" sales away from the acquired division to other divisions. 2014 WL 354496 at *6–7 (Del. Ch. Feb. 3, 2014).

These cases make clear that JDA cannot be held liable for breach of the implied covenant merely because it failed to undertake some action that would have purportedly increased Retail Pipeline's earn-out—specifically, developing "Flowcasting 2.0 or similar product"—even if the parties had discussed that JDA would undertake such an action. Indeed, the MIPA was executed after more than a year of negotiations, much of which centered on the details of the earn-out provision. During the course of those negotiations, Landvater and Martin pushed for the contract to stipulate to the integration of certain Flowcasting features into D&F, but JDA rejected those proposals. The fact that JDA rejected those proposals establishes that JDA's failure to create a product of that nature is not the sort of unanticipated gap on which an implied covenant claim can

rest. *See Buckeye Partners, L.P. v. GT USA Wilmington, LLC*, 2022 WL 906521, at \*21 (Del. Ch. Mar. 29, 2022) ("The implied covenant should not be used to fill the gap left by a rejected term because doing so would grant a contractual right or protection that the party failed to secure at the bargaining table.").

Nevertheless, Retail Pipeline asserts that JDA did not merely fail to create "Flowcasting 2.0 or similar product" but rather took affirmative steps to "thwart" Retail Pipeline's reasonable expectations, including by failing to allocate the necessary resources to the development team and by removing Landvater from his role in product management at JDA and eventually terminating him altogether. Appellant's Opening Br. at 56. But nothing in the evidence suggests that JDA's actions were intended to undermine the earn-out payment. Rather, the evidence demonstrates the JDA legitimately focused its efforts and resources on monetizing those aspects of the acquired intellectual property that it viewed as most promising. Accordingly, the district court did not err in granting summary judgment to JDA on Retail Pipeline's claim of a breach of the implied covenant.

\*　　　\*　　　\*

We have considered all of Retail Pipeline's remaining arguments and find them to without merit. Accordingly, we **AFFIRM** the judgment of the district court.

.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court

9