# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| PHYSIOTHERAPY CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2017-0396-TMR |
| SAMUEL E. MONCURE, III and PHOENIX REHABILITATION AND HEALTH SERVICES, INC., | ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION

Date Submitted: February 8, 2018
Date Decided: March 12, 2018

James D. Taylor, Jr. and Gerard M. Clodomir, SAUL EWING ARNSTEIN & LEHR LLP, Wilmington, Delaware; *Attorneys for Plaintiff.*

Daniel F. McAllister, BAIRD MANDALAS BROCKSTEDT, LLC, Dover, Delaware; *Attorney for Defendant Samuel E. Moncure, III.*

Scott A. Holt, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Scott R. Leah, TUCKER ARENSBERG, Pittsburgh, Pennsylvania; *Attorneys for Defendant Phoenix Rehabilitation and Health Services, Inc.*

**MONTGOMERY-REEVES, Vice Chancellor.**

This case examines the enforceability of a non-compete agreement against Defendant Samuel E. Moncure, III in light of an alleged prior contractual violation by Plaintiff Physiotherapy Corporation ("Physiotherapy" or the "Company"). Physiotherapy employed Moncure to manage physical therapy clinics in southern Delaware. Moncure's employment agreement with Physiotherapy (the "Employment Agreement") includes two provisions relevant to the instant case. The non-compete provision (the "Non-Compete") prohibited Moncure from conducting specified competitive activities within ten miles of the Physiotherapy clinics he managed. The Employment Agreement also set forth an incentive bonus plan (the "Bonus Plan"), which the Company could amend. Plaintiff contends that after Moncure left the Company, Moncure violated the Non-Compete. Moncure responds that he did not engage in violative competitive activities and, even if he did, that Physiotherapy's prior violation of the Bonus Plan excused his performance of the Non-Compete. For the reasons set forth in this Memorandum Opinion, I conclude that Physiotherapy's prior material breach of the Employment Agreement excuses Moncure's obligations under the Non-Compete.

I.    **BACKGROUND**

The facts in this opinion are my findings based on the parties' stipulations, 162 trial exhibits, including deposition transcripts, and the testimony of two live witnesses presented at a one-day trial before this Court held on October 4, 2017. I

1

grant the evidence the weight and credibility that I find it deserves.[1] I find Moncure to be highly credible and forthright.

Moncure began his career in physical therapy in 1994.[2] He worked as an independent contractor until joining Physiotherapy as an employee in 2008 to manage a number of clinics.[3] On February 3, 2008, Moncure and Physiotherapy executed the Employment Agreement.[4] Under that agreement, Moncure was to receive an annual base salary of $200,000[5] and a quarterly EBITDA-based bonus.[6] In 2009, Moncure and Physiotherapy executed an amendment to the bonus structure, under which Moncure would "participate in the Company's Clinic Incentive Plan (as amended from time-to-time by the Company), with such eligibility and incentive awards as determined in accordance with the terms and conditions of such plan."[7] The Bonus Plan entitled Moncure to an incentive bonus

---

[1] Citations to testimony presented at trial are in the form "Tr. # (X)" with "X" representing the name of the speaker. After being identified initially, individuals are referenced herein by their surnames without regard to formal titles such as "Dr." No disrespect is intended. Exhibits are cited as "JX #." Unless otherwise indicated, citations to the parties' briefs are to post-trial briefs.

[2] Tr. 26 (Moncure).

[3] *Id.* at 28 (Moncure).

[4] JX 1.

[5] *Id.* § 3.1.

[6] *Id.* § 3.2.

[7] JX 6 at 3.

based on the performance of the specific centers he managed.[8] Moncure continued under the Bonus Plan until the events giving rise to this litigation.

Moncure's performance as a manager and a physical therapist enabled him to negotiate his considerable compensation and the Bonus Plan. Moncure noted that his salary was "substantially" higher compared to what other physical therapists make "because of overseeing other clinics and having a longstanding track record of performance in those clinics."[9] And Moncure testified that "there were years where [his bonus] was up to 30, $35,000" as a result of his management of the clinics, representing "15, 18 percent of [his] salary at the time."[10] Physiotherapy does not dispute any facts surrounding Moncure's original compensation package.

The Employment Agreement bound Moncure to the Non-Compete. Pursuant to Section 8.1 of the Employment Agreement:

> In consideration of the Company's agreement to employ Employee pursuant to the terms hereof, the Employee agrees that, during his employment with the Company and for twelve (12) months following the date of the Employee's termination from the Company, he will not directly or indirectly: (a) engage, whether as principal, agent, investor, representative stockholder (other than as the holder of not more than five percent (5%) of the stock

---

[8]   *Id.* at 1.

[9]   Tr. 32 (Moncure).

[10]   *Id.* at 130 (Moncure).

or equity of any corporation, the capital stock of which is publicly traded), employee, consultant, volunteer or otherwise, with or without pay, in any business venture involved in any way in the provision of outpatient rehabilitation services of a type and nature provided by the Company, anywhere within ten (10) miles of any of the Subject Centers[;] . . . (b) solicit or entice or endeavor to solicit or entice away from the Company or any of its subsidiaries any director, officer, employee, agent or consultant of the Company or any of its subsidiaries, either on his own account or for any person, firm, corporation or other organization, whether or not the person solicited would commit any breach of such person's contract of employment by reason of leaving the Company's service; (c) solicit or entice or endeavor to solicit or entice away any of the clients or customers of the Company or any of its subsidiaries, either on his own account or for any other person, firm, corporation or organization; or (d) employ any person who was a director, officer or employee of the Company or any of its subsidiaries on the date of the Employee's termination or at any time during the six month period immediately prior to such termination.[11]

Select Medical ("Select") acquired Physiotherapy through a stock purchase agreement in early 2016.[12]  Moncure testified—and Plaintiff did not contest—that following the acquisition, Moncure's new direct supervisor told him "to assume that the [Physiotherapy Bonus] [P]lan was no more because there was no [Physiotherapy]."[13]

---

[11]     JX 1 §8.1.

[12]     Tr. 36-37 (Moncure).

[13]     *Id.* at 130 (Moncure).

4

On May 16, 2016, Moncure was cc'ed on an email stating that "ALL EMPLOYEES at the Market Manager level will be on the SELECT MARKET MANAGER PLAN."[14] That email does not state which employees are Market Managers. The email includes an attachment entitled "Market Manager % of Salary Plan – EBITDA.doc,"[15] but neither party submitted that document to the Court. Further, that email states that "[f]or those . . . who will be overseeing [Physiotherapy] centers[,] I am awaiting [sic] for the official copy of the Center incentive plan . . . Once I have received it I will forward it to all of you so there is no miscommunication when discussing these plans."[16] Moncure testified at trial that he never received or saw such a plan (the "Select Plan").[17] Physiotherapy offered no evidence to the contrary.

On September 15, 2016, Moncure resigned from Physiotherapy.[18] Moncure explained that the absence of an incentive plan, along with disagreements with the Company's new owner, caused his resignation.[19] Moncure joined Phoenix on

---

[14]   JX 15.

[15]   *Id.*

[16]   *Id.*

[17]   Tr. 133 (Moncure).

[18]   JX 15.

[19]   Tr. 140 (Moncure).

September 18, 2016.[20] At that time, Phoenix was in the process of acquiring a location in Wilmington, and Phoenix did not have any other Delaware operations.[21] Within months, Phoenix opened two new clinics in Milford and Seaford—restricted areas under Moncure's Employment Agreement.[22] On May 25, 2017, Plaintiff initiated this action challenging the behavior of Moncure and Phoenix.

## II.    ANALYSIS

The complaint in this action alleges that Moncure violated the Non-Compete and Phoenix tortiously interfered with the enforcement of the Employment Agreement.[23] In particular, Plaintiff contends that Moncure violated the Non-Compete by managing Phoenix clinics within restricted areas and soliciting employees and physicians' referrals.[24] Plaintiff claims that Phoenix tortiously interfered by knowingly employing Moncure despite the Non-Compete.[25] Among other arguments, Defendants contend that Physiotherapy violated the Employment Agreement first by cancelling the Bonus Plan and, thus, cannot seek to enforce the

---

[20]    JX 61.

[21]    JX 51.

[22]    Tr. 151-53 (Moncure).

[23]    Compl. ¶¶ 24-32.

[24]    *Id.* ¶¶ 24-25.

[25]    *Id.* ¶¶ 30-31.

terms against Moncure.[26]  I conclude that Physiotherapy violated the Employment

Agreement first, excusing Moncure's performance of the Non-Compete.[27]

### A.    Legal Standard

Following trial, "Plaintiff[] . . . ha[s] the burden of proving each element,

including damages, of each of [his] causes of action against each Defendant . . . by

a preponderance of the evidence."[28]  "[P]roof by a preponderance of the evidence

means that something is more likely than not."[29]   "By implication, the

preponderance of the evidence standard also means that if the evidence is in

equipoise, Plaintiff[] lose[s]."[30]

"Delaware adheres to the 'objective' theory of contracts, *i.e.*, a contract's

construction should be that which would be understood by an objective, reasonable

third party."[31]  "When interpreting a contract, this Court 'will give priority to the

---

[26]    Defs.' Answering Br. 24-25.

[27]    Because I conclude that Physiotherapy violated the Employment Agreement first,
        I need not examine whether Moncure violated the Non-Compete.

[28]    *Revolution Retail Sys., LLC v. Sentinel Techs., Inc.*, 2015 WL 6611601, at *9 (Del.
        Ch. Oct. 30, 2015).

[29]    *Narayanan v. Sutherland Global Hldgs. Inc.*, 2016 WL 3682617, at *8 (Del. Ch.
        July 5, 2016) (citing *Agilent Techs., Inc. v. Kirkland*, 2010 WL 610725, at *13
        (Del. Ch. Feb. 18, 2010)).

[30]    *Revolution Retail*, 2015 WL 6611601, at *9 (quoting *2009 Caiola Family Tr. v.
        PWA, LLC*, 2015 WL 6007596, at *12 (Del. Ch. Oct. 14, 2015); *OptimisCorp v.
        Waite*, 2015 WL 5147038, at *55 (Del. Ch. Aug. 26, 2015)).

[31]    *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010).

7

parties' intentions as reflected in the four corners of the agreement,' construing the agreement as a whole and giving effect to all its provisions."[32] The terms of the contract control "when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language."[33] Standard rules of contract interpretation state that "a court must determine the intent of the parties from the language of the contract."[34] "In giving sensible life to a real-world contract, courts must read the specific provisions of the contract in light of the entire contract."[35]

Generally, "[i]f plaintiff is first guilty of a material breach of contract, it may not complain if defendant subsequently refuses to perform."[36] A "slight breach by one party, [however,] while giving rise to an action for damages, will not necessarily terminate the obligations of the injured party to perform under the

---

[32] *Salamone v. Gorman*, 106 A.3d 354, 367-68 (Del. 2014) (quoting *GMG Capital Invs., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779 (Del. 2012)).

[33] *Id.* at 368 (quoting *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997)).

[34] *Id.* (quoting *Twin City Fire Ins. Co. v. Del. Racing Ass'n*, 840 A.2d 624, 628 (Del. 2003)).

[35] *Chicago Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 913-14 (Del. 2017).

[36] *Dickinson Med. Gp., P.A. v. Foote*, 1989 WL 40965, at *7 (Del. Super. Mar. 23, 1989) (citing *Hudson v. D & V Mason Contractors, Inc.*, 252 A.2d 166, 170 (Del. Super. 1969)).

8

contract."[37]  Courts apply "[t]his general principle . . . in an action, such as this one to enforce a covenant not to compete."[38]  In the specific instance of non-competes, Delaware courts excuse performance of non-compete obligations following a material breach of an employment agreement where the amount involved is not *de minimis*, and the payment of the employee's compensation goes to the essence of the employment agreement.[39]

### B. Physiotherapy's Material Breach of the Employment Agreement Excuses Moncure's Performance Under the Non-Compete

Moncure argues that Physiotherapy violated the Employment Agreement by unilaterally discarding the Bonus Plan.[40]  Physiotherapy responds that the Bonus Plan empowered the Company to unilaterally amend the Bonus Plan by replacing it with a new Select Plan.[41]  Thus, I must determine whether Physiotherapy adopted a Select Plan that reflects an allowable amendment to the Bonus Plan.

Moncure testified that after Select acquired Physiotherapy, his manager at Select told him "to assume that the [Bonus] [P]lan was no more because there was

---

[37]  *Id.* at *8 (citing 11 *Williston on Contracts* § 1292, at 8 (3d ed. 1968)).

[38]  *Id.* at *7 (citing *Schutzman v. Gill*, 154 A.2d 226, 230 (Del. Ch. 1959); 54 Am.Jur2d *Monopolies, Restraints of Trade, and Unfair Trade Practices* § 570).

[39]  *Dickinson*, 1989 WL 40965, at *7; *see also Hipcricket, Inc. v. mGage, LLC*, 2016 WL 3910837, at *12 n.146 (Del. Ch. July 15, 2016) (applying Washington law but noting that Delaware follows the same rule).

[40]  Defs.' Answering Br. 24-25.

[41]  Pl.'s Reply Br. 3-4.

no [Physiotherapy]."[42]  Moncure further testified that he never received a copy of any bonus plan, and no one ever told him that he had a bonus plan while he was a Select employee.[43]  Physiotherapy does not contest that Moncure's manager told him that the Bonus Plan was cancelled.  Instead, Physiotherapy points to an email that it contends shows that Moncure had a new bonus plan, the Select Plan.

The express language of Select's email regarding incentive plans appears to mention two different incentive plans.  First, the email states that "ALL EMPLOYEES at the Market Manager level will be on the SELECT MARKET MANAGER PLAN."[44]  Second, the email notes that "[f]or those of you who will be overseeing PHYSIO centers, I am awaiting [sic] for the official copy of the Center incentive plan for PHYSIO."[45]

The face of the email, however, is ambiguous as to whether any incentive plan existed for Moncure.  Neither the email nor any other evidence presented demonstrates that Moncure's official title was "Market Manager."  No part of the email makes clear whether one of the plans applied to Moncure.  Even if one of the plans did apply to Moncure, the email does not indicate which one, and

---

[42]     Tr. 130 (Moncure).

[43]     *Id.*

[44]     JX 15.

[45]     *Id.*

10

Physiotherapy does not present arguments or explanations on this point. Further, I am unable to review the attachments to the email or any later plan, as no one has provided them to the Court. Thus, Moncure's credible trial testimony and the one piece of direct contemporaneous evidence referenced by Physiotherapy suggests that Physiotherapy unilaterally discarded the Bonus Plan and perhaps enacted a new Select Plan to which Moncure did not consent. But Physiotherapy presented no evidence and cited no case law to support the proposition that discarding one incentive plan and perhaps enacting a different plan constitutes an amendment of the original plan. Moncure persuades the Court that Physiotherapy discarded his Bonus Plan, and Physiotherapy fails to carry its burden to show that Physiotherapy adopted an allowable amended incentive plan in its place.

Physiotherapy now points to the fact that the Bonus Plan expressly allowed amendments,[46] which Moncure acknowledges occurred in the past,[47] and tries to cast the Select Plan as an amendment. To the extent I can conclude that a Select Plan existed and covered Moncure, I address that argument. At Moncure's deposition, Physiotherapy showed Moncure what Physiotherapy alleges is the

---

[46] The terms of the Bonus Plan allowed the plan to be "amended from time-to-time by the Company." JX 6 at 3.

[47] Moncure agrees that, over the years, he acknowledged Physiotherapy's changes to "metrics . . . used to measure" performance as acceptable amendments to the Bonus Plan. Tr. 38 (Moncure).

11

Select Plan used to replace the original Bonus Plan. Moncure contends he first saw the Select Plan at his deposition.[48] Despite this, Moncure noted that the document put before him at his deposition (i) provided for annual bonuses, instead of quarterly bonuses like the Bonus Plan and (ii) capped bonus amounts as a percentage of his salary, regardless of how much EBITDA was produced by the clinics he managed, unlike the Bonus Plan.[49] Physiotherapy points only to Moncure's distinctions as evidence that the Company's changes to the Bonus Plan are not material and simply reflect an amendment. But Physiotherapy did not even present the Select Plan to the Court to allow an evaluation of how that plan varies from the Bonus Plan. And Physiotherapy failed to provide compelling arguments that these terms are sufficiently similar.

The evidence presented at trial shows that Physiotherapy discarded Moncure's contractually negotiated Bonus Plan, which it perhaps unilaterally replaced with another plan. The evidence also shows that Physiotherapy failed to

---

[48]     *Id.* at 130-31 (Moncure). Physiotherapy provides no evidence that the Select Plan shown to Moncure at the deposition was the same incentive plan referenced in the Select email, or that the plan referenced in that email even existed in set, formal terms at the time of the email. The email itself noted, "I am awaiting [sic] for the official copy of the Center incentive plan . . . Once I have received it I will forward it to all of you so there is no miscommunication when discussing these plans." JX 15. Thus, it is not clear whether Select was in the process of creating the plan at the time of the email, or if the sender of the email just did not yet have a copy of the plan itself.

[49]     Tr. 131 (Moncure).

provide Moncure or the Court with the details of a new incentive plan, to allow either Moncure or the Court the opportunity to evaluate its terms. Physiotherapy fails to offer convincing evidence or arguments that, to the extent a new plan even existed, those two plans were sufficiently similar to constitute an allowable amendment. On its face, this does not constitute an amendment to the incentive plan provision of the Employment Agreement. And Physiotherapy presented no evidence that Moncure accepted the change to the Bonus Plan. Far from it, Moncure cited the removal of the Bonus Plan as a reason for leaving Physiotherapy.[50]

Moreover, Physiotherapy's actions affected a material portion of Moncure's overall compensation package, a central feature of the Employment Agreement. Moncure testified that he only negotiated two terms of the Employment Agreement: "[his] salary and [his] participation in the [Bonus Plan]."[51] Moncure further testified that the bonus was "up to . . . $35,000" in some years, constituting "15, 18 percent of [his] salary at the time."[52] The Bonus Plan constituted a substantial portion of Moncure's overall compensation.[53] In fact, this far exceeds

---

[50] Tr. 140 (Moncure).

[51] *Id.* at 121-22 (Moncure).

[52] *Id.* at 130 (Moncure).

[53] *Id.*

what another Delaware case has found to be material in the context of excusing non-compete obligations.[54]   Thus, the Bonus Plan was a key part of the Employment Agreement.

Physiotherapy's prior material breach of the Employment Agreement through its cancellation of the Bonus Plan excuses Moncure's performance of the Non-Compete and implies that Phoenix did not tortiously interfere with the (unenforceable) Non-Compete provision in the Employment Agreement.

## III.   CONCLUSION

For the foregoing reasons, I find in favor of Defendants and conclude that Physiotherapy's violation of the Employment Agreement excused Moncure's performance under the Non-Compete and bars the tortious interference claim against Phoenix.

**IT IS SO ORDERED**.

---

[54]   *Dickinson*, 1989 WL 40965, at \*7-8 (excusing performance of a non-compete provision following failure to pay $4,147 owed as a bonus, compared to a salary of $90,000).

14