IN THE SUPREME COURT OF THE STATE OF DELAWARE

|  | § |  |
|---|---|---|
| EXIT STRATEGY, LLC, | § | No. 318, 2023 |
|  | § |  |
| Plaintiff Below, | § | Court Below: Court of Chancery |
| Appellant, | § | of the State of Delaware |
|  | § |  |
| v. | § |  |
|  | § | C.A. No. 2017-0017 |
| FESTIVAL RETAIL FUND BH, L.P. | § |  |
|  | § |  |
| Defendant Below, | § |  |
| Appellee. | § |  |

Submitted: May 15, 2024
Decided: July 25, 2024

Before **SEITZ**, Chief Justice; **VALIHURA**, **TRAYNOR**, **LEGROW**, and **GRIFFITHS**, Justices, constituting the Court *en banc*.

Upon appeal from the Court of Chancery of the State of Delaware. **AFFIRMED**.

David A. Jenkins, Esquire (*argued*), Jason Z. Miller, Esquire, SMITH, KATZENSTEIN & JENKINS LLP, Wilmington, Delaware, *for Appellant Exit Strategy, LLC*.

Douglas D. Herrmann, Esquire, James H.S. Levine, Esquire (*argued*), TROUTMAN PEPPER HAMILTON SANDERS LLP, Wilmington, Delaware, Andrew W. Zepeda, Esquire, LURIE, ZEPEDA, SCHMALZ, HOGAN & MARTIN, Los Angeles, California, *for Appellee Festival Retail Fund BH, L.P.*

**LEGROW**, Justice:

The parties to this appeal entered into a partnership agreement that established the financial conditions under which the appellant would receive a distribution upon the sale of the partnership's principal asset. The partnership agreement set a net-sale-price threshold above which the appellant would receive a distribution, and the agreement directed the general partner to calculate that net sale price by deducting certain categories of costs from the gross sales price. The general partner ultimately determined that the deductions permitted by the partnership agreement reduced the net sale price below the minimum threshold for a distribution.

Although the appellant challenged several of the deductions at trial, the Court of Chancery held that one was outcome determinative: the deduction for the costs that the partnership incurred to defease the interest payments on the mortgage and thereby remove the encumbrance from the asset so that it could be sold. The court concluded that this deduction was proper under the partnership agreement and therefore entered judgment in favor of the partnership. Although the Court of Chancery mischaracterized the contractual formula applicable to this deduction, we affirm the court's judgment because, properly characterized, the plain language of the partnership agreement and the formula permit the challenged deduction. We therefore do not reach the effect or correctness of the Court of Chancery's alternative holding that the general partner's good faith in calculating the net sale price eliminated any breach of contract claim.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Unless otherwise noted, the facts are taken from the Court of Chancery's July 17, 2023 Post-Trial Memorandum Opinion.

### A. The Parties

Plaintiff-Below, Appellant Exit Strategy, LLC ("Exit") is a New York limited liability company.[1]  Exit invests in commercial real estate.  Defendant-Below, Appellee Festival Retail Fund BH, L.P. ("Festival") is a Delaware limited partnership with its principal place of business in California.[2]  Defendant-Below FRFBH, LLC, is a Delaware limited liability company and Festival's General Partner (the "General Partner").[3]  Defendant-Below Mark Schurgin was the General Partner's president and controlled the General Partner through that position.[4]  Neither Schurgin nor the General Partner is a party to this appeal.  Festival's sole limited partner is Festival Retail Fund 1, L.P. (the "Limited Partner"), a Delaware limited partnership and non-party to the action.[5]

---

[1] App. to Opening Br. at A129 (Joint Pre-Trial Stipulation and Proposed Order).

[2] *Id*.

[3] *Id*.

[4] *Id*.; *Exit Strategy, LLC v. Festival Retail Fund BH, L.P., et al*, 2023 WL 4571932, at *3 (Del. Ch. Jul. 17, 2023).

[5] App. to Opening Br. at A129 (Joint Pre-Trial Stipulation and Proposed Order).

Exit, the General Partner, and the Limited Partner are parties to the Limited Partnership Agreement of the Partnership (the "LPA"), the governing document in this litigation.[6]

## B. Acquisition of the Gucci Store and Relevant LPA Provisions

In 2005, Exit acquired an option to purchase property on Rodeo Drive in Beverly Hills, California, from its then-owner, Elizabeth Luster.[7] The property houses the flagship Gucci store (hereinafter the "Gucci Property").

Exit, however, did not have the capital to exercise its option. In 2007, Exit assigned its option to Festival.[8] Festival immediately exercised the option and acquired the Gucci Property for $39 million.[9] In exchange for the option's assignment, Festival paid Exit over $11 million and Exit became Festival's "Special Limited Partner."[10] Although the LPA refers to Exit as a Special Limited Partner, Exit had "no voting or other rights" except a contingent right to receive an additional payment if the Gucci Property was later resold (the "Special Limited Partner Portion").[11] The LPA explains that in the event of a Resale, "the Resale Proceeds

---

[6] *Id*. at A129 (LPA); *Id*. at A367 (LPA).

[7] *Id*. at A130 (Joint Pre-Trial Stipulation and Proposed Order).

[8] *Id*.; *Id*. at A154 (Agreement to Assign and Assume).

[9] *Id*. at A130 (Joint Pre-Trial Stipulation and Proposed Order).

[10] *Id*. at A130 (Joint Pre-Trial Stipulation and Proposed Order); *Id*. at A359 (LPA).

[11] *Id*. at A130 (Joint Pre-Trial Stipulation and Proposed Order); *Id.* at A364 (LPA); *Id.* at A367 (LPA).

shall be distributed first, 100% to [Exit] until the cumulative amount distributed to

[Exit] equals [Exit's] portion."[12]  To determine what Exit's Portion is, if anything,

the LPA provides the following definition:

> "Special Limited Partner's Portion" means, with respect to a Resale, the amount equal to (i) the Base Resale Distribution Amount (as shown in Schedule D) for the Applicable Resale Year plus (ii) an amount equal to 10% of the amount by which the Net Resale Price exceeds the Resale Price Threshold for such Resale Year.[13]

Schedule D contains a table listing each Resale year starting in 2007, with a

Resale Price Threshold and corresponding Base Resale Distribution Amount.[14]

Schedule D also provides that,

> If for any Resale, the Net Resale Price is less than the Resale Price Threshold for the applicable Resale Year, the Base Resale Distribution Amount shall be reduced by one dollar for each dollar by which the Resale Price Threshold exceeds the Net Resale Price until the Base Resale Distribution Amount has been reduced to zero.[15]

Net Resale Price is then defined as "the gross sales price derived from the

Resale . . . reduced by one of the following [eight] items."[16]  We refer to any

reductions in gross sales price as "Deductions."

---

[12] *Id.* at A367 (LPA).

[13] *Id.* at A385 (LPA).

[14] *Id.* at A388 (LPA).

[15] *Id.*

[16] *Id.* at A382 (LPA).

To summarize a relatively simple concept lost in embedded definitions: if the Deductions to the gross sales price exceed a certain amount, such that the Net Resale Price falls below the difference between the Resale Price Threshold and the Base Resale Distribution Amount for the sale year, Exit receives no Special Limited Partner Portion. And this is where the friction arose in this case: after the General Partner calculated the Deductions that it believed were authorized by the LPA, the Base Resale Distribution Amount was reduced to zero, and Festival advised Exit that no Special Limited Partner Portion would be paid. Exit disputed the propriety of certain Deductions and ultimately filed suit. Only certain categories of Deductions are relevant to the issues raised on appeal, and we conclude that only one category— Excess Loan Costs—is dispositive of Exit's claims.

The LPA allows the General Partner to deduct "[a]ny excess costs associated with any loan on the Property during [Festival's] ownership."[17] These deductions are termed as "Excess Loan Costs" and are defined in Subsection (f) to the definition of "Net Resale Price" as:

> loan interest costs, points, loan origination fees, negative accruals, and similar costs to the extent they exceed the aggregate of the following items: (i) loan origination fees to the extent actually paid by the Limited Partner or the Partnership, but not more than $550,000.00; and (ii) the amount by which aggregate loan interests costs in any year (whether paid currently or accruing and including any interest that accrues on interest) exceed Rental Payments . . . for such year, but only to the extent such excess of such loan interest costs in such year over Rental

---

[17] *Id.*

5

Payments in such year exceeds $875,000.000 (subject to proration for any partial year).[18]

Subsection (f) then defines "Rental Payments" "to mean the aggregate of all rents collected by [Festival] from Gucci or any other tenant pursuant to the existing lease or any renegotiated lease with Gucci or such other tenant during such year."[19] Gucci paid rent to Festival during the seven years it owned the property. The trial court found that Gucci's rent payments never exceeded $875,000 annually,[20] but the parties agree that the annual rent was approximately $3 million.[21]

Although the deductions in Subsection (f) are the only type of deduction discussed in our analysis, two other categories of deductions were raised during trial and considered by the Court of Chancery as permitting a deduction for defeasance costs. Subsection (d) allows the General Partner to reduce the gross sales price by "[a]ny other costs or expenses associated with the ownership, development, redevelopment, improvement, operation, leasing, management . . ., maintenance, repair and renovation of the Property reasonably borne by [Festival] during [Festival's] ownership, to the extent not reimbursed by Gucci or other tenant."[22]

---

[18] *Id.* at A382–83 (LPA).

[19] *Id.* at A383 (LPA).

[20] *Exit Strategy, LLC*, 2023 WL 4571932, at *14.

[21] App. to Opening Br. at A1747 (Emanuel Direct. Exam).

[22] *Id.* at A382 (LPA).

6

Subsection (h) also allows the General Partner to deduct the following costs: "[a]ll actual documented out-of-pocket closing costs and costs of sale incurred in connection with such Resale, including without limitation, actual documented out-of-pocket survey and title costs, documentary transfer taxes, recording fees, escrow charges and reasonable attorneys' fees and costs."[23]

From January 2007 to January 2014, Festival owned the Gucci Property.[24] To finance the initial purchase, Festival entered into a Loan Agreement with Column Financial, Inc. and secured a mortgage on the property (the "Loan").[25] Relevantly, the Loan Agreement allowed Festival to sell the property unencumbered by the Loan through a process called "defeasance."[26] Defeasance allows a borrower to replace the collateral on a loan, here the Gucci Property, with a portfolio of low-risk securities yielding a rate of return that economically replicates the interest due under the loan.[27] Defeasance typically requires the borrower to pay a premium because the low-risk securities have a lower interest rate than the Loan, so the borrower is required to purchase securities with a higher cost than the outstanding loan balance.[28]

---

[23] *Id*. at A383 (LPA).

[24] *Id*. at A131 (Joint Pre-Trial Stipulation and Proposed Order).

[25] *Id*. at A394 (Loan Agreement).

[26] *Id*. at A422–23 (Loan Agreement).

[27] *Id*. at A1931–32 (P. Avery Direct Exam).

[28] *Id*.

## C. 2014 Sale and Challenged Deductions

On January 7, 2014, the Partnership sold the Gucci Property to non-party Ponte Gadea California, LLC for a gross price of $108 million.[29] The Purchase and Sale Agreement required Festival to "remove, by payment, bonding or otherwise . . . any deeds of trust or mortgages that secure indebtedness against" the Gucci Property.[30] In accordance with this provision, Festival defeased the Loan at a premium, $6,250,155, thereby removing the mortgage from the Gucci Property in accordance with the Loan Agreement.[31] The General Partner deducted this cost from the gross sales price when calculating Exit's Special Limited Partner Portion.

In addition to the $6,250,155 in Defeasance Deductions, the General Partner also reduced the gross sales price by $4,556,486 in Negative Accruals Deductions, $1,266,532 in Preferred Return Deductions (together with the Defeasance Deductions and Negative Accruals Deductions, the "Challenged Deductions"), and $6,004,579 in miscellaneous, unchallenged deductions, for a total of $18,077,752 in deductions.[32] These deductions resulted in a Net Resale Price of $89,922,248.[33]

---

[29] *Id*. at A131 (Joint Pre-Trial Stipulation and Proposed Order); Court of Chancery D.I. 147 at 115 (Post-Trial Oral Argument).

[30] App. to Answering Br. at B249 (Purchase and Sale Agreement).

[31] *Id*. at B321–23 (Loan Defeasance Report).

[32] App. to Opening Br. at A2001 (Exit's Post-Trial Opening Br.)

[33] Originally, Festival did not take the Negative Accruals Deductions, and the Net Resale Price was calculated as $94,534,742. App. to Opening Br. at A503 (Gucci Sales Analysis Summary of

Because the sale occurred in 2014, the General Partner used the following figures from Schedule D of the LPA: Resale Price Threshold = $100 million; Base Resale Distribution Amount = $3.0 million.[34] Recall that Exit was not entitled to its Special Limited Partner Portion under the LPA if the Net Resale Price fell below the difference between Resale Price Threshold and Base Resale Distribution Amount.[35] For a 2014 sale, the Net Resale Price would have had to exceed $97 Million for Exit to receive any Special Limited Partner Portion. Because the General Partner calculated the Net Resale Price to be $89,922,248, Exit did not receive any distribution.[36]

On January 17, 2014, Exit's attorney, Andrew Chonoles, sent a letter to Schurgin in his capacity as the General Partner's President, inquiring about the 2014 Sale and requesting a distribution of the proceeds provided for under the LPA.[37] The next day, Schurgin responded to Chonoles's letter, acknowledging that the sale had occurred but asserting that Exit was not entitled a distribution because the Net Resale Price was insufficient to trigger payment under Schedule D.[38]

---

Accounting for the 2014 Sale). This did not affect Exit's distribution because the Net Resale Price was less than the Base Resale Distribution Amount subtracted from the Resale Price Threshold.

[34] App. to Opening Br. at A388 (LPA).

[35] *Id*.

[36] *Id*. at A132 (Joint Pre-Trial Stipulation and Proposed Order).

[37] *Id*. at A131 (Joint Pre-Trial Stipulation and Proposed Order); *Id*. at A549 (Letter from Chonoles).

[38] *Id*. at A131 (Joint Pre-Trial Stipulation and Proposed Order); *Id*. at A553–54 (Letter from Schurgin). Schurgin also asserted that Festival was not required to pay the distribution because an

**D. Procedural History**

On January 12, 2017, Exit filed a Verified Complaint in the Court of Chancery, asserting breach of contract claims against Festival and the General Partner in relation to the Challenged Deductions.[39] Exit then filed its Amended Verified Complaint on December 22, 2017, adding claims alleging that the General Partner acted in "bad faith" when it calculated the Challenged Deductions.[40] After the Court of Chancery denied Festival's Motion to Dismiss the Amended Complaint and Request for Leave to Move for Summary Judgment, the court held a three-day trial in September 2022.[41] Exit presented live testimony from four witnesses, and Festival presented live testimony from three witnesses, including Schurgin.

The parties then engaged in a round of post-trial briefing, and the Court of Chancery heard argument on the narrowed issues presented in the briefing on April 17, 2023.[42] Exit argued that the Challenged Deductions violated the LPA, that Schurgin calculated the deductions in bad faith, and that the Sale constructively occurred in 2013–which would lower the Resale Price Threshold by $10 million and

---

unrelated sale of the Partnership's interest in 2011 divested Exit of its interest. Because this issue was not relevant to the trial court's analysis, we do not address it any further.

[39] App. to Opening Br. at A1 (Court of Chancery Docket).

[40] App. to Answering Br. at B4 (Amended Verified Complaint).

[41] App. to Opening Br. at A29 (Court of Chancery Docket).

[42] Court of Chancery D.I. 147 (Post-Trial Oral Argument).

thereby obviate the need to resolve whether the Challenged Deductions were contractually permitted.[43]

The Court of Chancery published its Post-Trial Memorandum Opinion on July 17, 2023, finding in favor of Festival, the General Partner, and Schurgin on all counts.[44] The trial court only analyzed Exit's breach claims as to the Defeasance Deduction because—if properly deducted—the defeasance costs combined with the unchallenged deductions would reduce the Net Resale Price below $97 million.[45] Exit did not dispute that basic mathematical calculation on appeal, and our analysis therefore follows the same theory. In interpreting the meaning of Subsections (f), (d), and (h), the Court of Chancery did not consider any extrinsic evidence, holding that the provisions were unambiguous as to Festival's deduction of defeasance costs.[46]

The trial court held that Festival properly deducted defeasance costs under either Subsection (f), (d), or (h).[47] In its analysis, the trial court mischaracterized the formula in Subsection (f) as follows: "Excess Loan Costs are deductible if 'the amount by which aggregate loan interest costs in any year . . . exceed Rental

---

[43] App. to Opening Br. at A1975–76 (Exit's Post-Trial Opening Brief).

[44] *Exit Strategy, LLC*, 2023 WL 4571932.

[45] *Id*. at *12.

[46] *Id*. at *16.

[47] *Id*. at *14–15.

Payments,' defined as a threshold amount of payments from the Property's tenant. *The Rental Payment threshold is fixed at a notional amount of '$875,000.00'*"[48] As we explain below, the formula establishes that Excess Loan Costs are deductible if the aggregate loan costs in that year exceed the sum of rental payments and $875,000, with the latter amount prorated for any partial year.

The trial court also found that the Sale occurred in 2014, not 2013 as Exit argued, and that Schurgin did not act in bad faith when he took the Challenged Deductions.[49] Exit does not challenge either of these holdings on appeal.

## E. Contentions on Appeal

Exit timely filed this appeal only as to its breach of contract claims against Festival, arguing that the Court of Chancery erred when it held that Subsections (f), (d), and (h) permitted Festival to deduct defeasance costs from the gross sales price.[50] Exit also argues that the trial court committed error when it suggested that the General Partner's good faith would bar Exit's recovery under a breach of contract claim. In response, Festival contends that despite the trial court's misinterpretation of the formula in Subsection (f), defeasance costs were still properly deducted from the gross sales price when the formula is applied correctly.[51] Festival also posits that

---

[48] *Id.* at *4 (emphasis added).

[49] *Id.* at *10–11.

[50] *See generally* Opening Br. at 34–44.

[51] Answering Br. at 38 n.11.

Exit's arguments on appeal are barred because it did not appeal the trial court's findings regarding the defendants' good faith conduct. Specifically, Festival relies on the Court of Chancery's holding that Schurgin and the General Partner acted in good faith when making the deductions and that because Festival acted through those parties when it made the deductions, the breach of contract claims are barred.[52]

## II. STANDARD OF REVIEW

We review the Court of Chancery's contractual interpretation *de novo*.[53] Because the argument on appeal, and therefore our analysis, is constrained to contract interpretation, we do not review the court's post-trial factual findings and accept them as accurate.

## III. ANALYSIS

To begin, although Exit challenges the Court of Chancery's interpretation of Subsections (f), (d), and (h), and its holding that defeasance costs fit within each of those categories of permitted deductions, our decision only reaches the meaning and application of Subsection (f). Once we determine that the defeasance costs were properly deducted under Subsection (f), the inquiry ends because that calculation reduced Exit's Special Limited Partner Portion to zero.

---

[52] The parties agree that the LPA identifies "good faith" as the governing standard for the General Partner's conduct.

[53] *Sunline Commercial Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 845 (Del. 2016).

13

## A. The Defeasance Deduction was proper under Subsection (f).

Exit's argument that the LPA's definition of Excess Loan Costs does not encompass defeasance costs 1) relies on extrinsic evidence, and 2) is entirely at odds with its admissions that "defeasance was a replacement for the post-sale interest payments," "'loan interest costs' are one of the possibly-permitted deductions under that definition,"[54] and defeasance costs "could, under certain circumstances fit within 'Excess Loan Costs.'"[55] Exit's arguments on appeal never reconcile its interpretation of Subsection (f) with either the LPA's plain language or Exit's admissions. Because the LPA is unambiguous and the Court of Chancery properly refused to consider extrinsic evidence,[56] we hold that defeasance costs were deductible as Excess Loan Costs.

First, the Court of Chancery did not err when it refused to consider extrinsic evidence as to Subsection (f)'s meaning.[57] Delaware follows the objective theory of

---

[54] Opening Br. at 39.

[55] *Id*. (citing App. to Opening Br. at A1770 (Emanuel Direct Exam.)); App. to Opening Br. at A2014 (Exit's Post-Trial Opening Brief); Court of Chancery D.I. 147 at 48–49; 52 (Post-Trial Oral Argument Tr.).

[56] Although the Court of Chancery excluded extrinsic evidence because it found that Exit conceded that the LPA's language was unambiguous, we do not base our decision on this judicial admission and instead conclude that the plain language of Subsection (f) is unambiguous. *See Exit Strategy, LLC,* 2023 WL 4571932, at *12.

[57] *Id*. at *16. The extrinsic evidence that Exit introduced to prove that defeasance costs were not encompassed by Subsection (f) included testimony from its principal, Steven Emanuel, explaining Subsection (f)'s evolution through the LPA's drafting process. Emanuel testified that each of Excess Loan Costs's inputs were dictated by Festival's need to obtain a 16% internal rate of return—not to deduct additional costs from the gross sales price. App. to Opening Br. at A1755–57 (Emanuel Direct Exam.).

contracts, where the parties' intent is determined by considering only the "four corners of the agreement."[58] And where contract terms establish the parties' common meaning, they control.[59] "The parol evidence rule bars the admission of evidence extrinsic to an unambiguous, integrated written contract for the purpose of varying or contradicting the terms of that contract."[60] It is the "sole province" of the court to determine whether a contract is ambiguous, and the parties' disagreement over a contract's interpretation does not render it so.[61] Rather, contract terms are ambiguous only when they "are fairly susceptible of different interpretations or may have two or more different meanings."[62]

Subsection (f) is not ambiguous. The Loan Agreement between Festival and its mortgage lender expressly defines defeasance costs;[63] the LPA gave the General Partner sole discretion to enter into financing agreements, including the Loan Agreement;[64] and the Sale Agreement between Festival and Ponte Gadea required

---

[58] *Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014).

[59] *Id.*

[60] *Galantino v. Baffone*, 46 A.3d 1076, 1081 (Del. 2012).

[61] *Weinberg v. Waystar, Inc.*, 294 A.3d 1039, 1044 (Del. 2023).

[62] *GMG Capital Investments, LLC v. Athenian Venture Partners, I, L.P.*, 36 A.3d 776, 780 (Del. 2012) (quoting *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997)).

[63] App. to Opening Br. at A422–23 (Loan Agreement).

[64] *Id.* at A361 (LPA).

15

Festival to clear encumbrances from the Gucci Property, which in turn required Festival to defease the Loan.[65]

Defeasance replicated and replaced the remaining interest on the Loan, and those interest costs were plainly deductible under Subsection (f), which defines Excess Loan Costs as "loan interest costs, points, loan origination fees, negative accruals, and *similar* costs."[66]

Exit's first argument—that Subsection (f) is ambiguous because defeasance costs are not mentioned by name—is not convincing.[67] We find no ambiguity in the contractual language. Subsection (f) expressly defines Excess Loan Costs as including "loan interest costs . . . and *similar* costs."[68] The only reasonable interpretation is that this includes defeasance costs, which replace interest costs— something Exit's own witness admitted—*verbatim*—during his deposition.[69]

Moreover, Exit admitted to the Court of Chancery on numerous occasions that defeasance costs could be loan interest costs within the meaning of Subsection (f).[70]

---

[65] App. to Answering Br. at B249 (Purchase and Sale Agreement).

[66] App. to Opening Br. at A382 (LPA) (emphasis added).

[67] Opening Br. at A28.

[68] App. to Opening Br. at A383 (LPA).

[69] *Id*. at A944 (Emanuel Dep. Tr.) ("to the extent that the $6.2 million represented treasury securities that were intended to function, and did function, as a precise replacement for monthly interest costs that would come due during the final post sale to Ponte Gadea Mortgage, those are to be treated as interest costs and analyzed under (f)").

[70] *Id*. at A1770 (Emanuel Direct Exam.); *Id*. at A2014 (Exit's Post-Trial Opening Brief); Court of Chancery D.I. 147 at 48–49; 52 (Post-Trial Oral Argument Tr.).

We do not accept Exit's change in position and, together with the plain meaning of Subsection (f), hold that Festival could deduct defeasance costs from the gross sales price as Excess Loan Costs under Subsection (f).

Undeterred, Exit alternatively argues that if defeasance costs constitute Excess Loan Costs, they nevertheless were not properly deducted under the formula contained in Subsection (f). Subsection (f) allows Festival to deduct excess loan costs when they exceed the sum of: (i) "loan origination fees to the extent actually paid by the Limited Partner or the Partnership, but not more than $550,000.00" and (ii) "the amount by which aggregate loan interests costs in any year . . . exceed Rental Payments . . . for such year, but only to the extent such excess of such loan interest costs in such year over Rental Payments in such year exceeds $875,000.000 (subject to proration for any partial year)."[71] Because Festival did not deduct any loan origination fees under (i), our focus is on the second half of this formula.

Exit first argues that the Court of Chancery misinterpreted and misapplied the formula required by Subsection (f) when it held that "[t]he Rental Payment threshold is fixed at a notional amount of '$875,000.00 (subject to proration for any partial year).'"[72] Although we agree with Exit that the trial court misinterpreted Subsection (f)'s formula, we conclude that the error was harmless because the application of the

---

[71] App. to Opening Br. at A382 (LPA).

[72] *Exit Strategy, LLC*, 2023 WL 4571932, at *4.

correct formula yields the same result: loan interest costs—defeasance costs totaling over $6 million—exceed the rental payments received in 2014—a fraction of $3 million—by more than $875,000.[73]

To avoid this straightforward mathematical calculation and preserve its challenge to the Defeasance Deduction, Exit contends that defeasance costs must be prorated over the remaining term of the Loan, which, by Exit's calculations, would reduce loan interest costs to less than the sum of the rental payments and the prorated portion of $875,000.[74] Exit insists that Subsections (f)'s language "subject to proration for any partial year" applies to all the inputs in the formula, not just the $875,000 threshold.[75] We disagree and find no support for Exit's position in the contractual language.

As a matter of the contract's plain language and straightforward logic, we conclude that proration applies only to the $875,000 threshold that the formula adds to the rental payments.[76] First, the formula refers to "loan interest costs in *such year*" and "Rental Payments in *such year*," making any reference to proration both

---

[73] Although the record is unclear regarding the precise amount of annual rent, counsel agreed at Oral Argument that it was not $875,000 and had increased in 2014 from $1.125 to $3 million. Supreme Court Oral Argument at 49:50–49:55.

[74] Opening Br. at 40.

[75] *Id.*

[76] The proration language in Subsection (f) appears only at the end of the clause and in reference to the $875,000, not earlier in the formula.

unnecessary and duplicative. Second, practically speaking there is no need to prorate costs, which are incurred at a particular time, or rental payments, which are already separated into monthly amounts and received periodically. Accordingly, the only reasonable interpretation is that only the $875,000 threshold must be prorated so that it does not have an outsized effect in any particular year.

Although only a small portion of the 2014 Gucci rent accrued before the Sale occurred on January 7, Festival incurred the *entire* defeasance cost on January 7.[77] As Exit explained, the formula in Section (f) was intended to "protect Festival against higher-than-expected loan costs, mainly loan interest costs,"[78] which is exactly what occurred when Festival cleared the Gucci Property's mortgage in January 2014 and incurred $6,250,155 in defeasance costs.

Moreover, Subsection (f) contemplated the possibility that Festival would incur loan interest costs in installments or one single payment. The formula provides that aggregate loan interest costs can either be "paid currently or accruing and including any interest that accrues on interest."[79] Ultimately, Exit's witness testified that Festival collected only seven days of rent in 2014 and that Festival paid

---

[77] App. to Answering Br. at B321–23 (Defeasance Report).

[78] App. to Opening Br. at A1799 (Emanuel Cross Exam).

[79] *Id*. at A382 (LPA).

$6,250,155 to purchase the securities that replaced the Gucci Property as collateral when Festival defeased the Loan.[80]

Finally, during this Court's oral argument, Exit's counsel explained, in conclusory fashion, that "if you are going to prorate [rent] you have to prorate both [the rent and defeasance costs]."[81] This statement demonstrates Exit's misunderstanding as to the purpose of Subsection (f)'s proration, which is to maintain the same outcome whether the Gucci Property was sold early or late in a calendar year. At no point during this Court's proceedings or in the trial court could Exit explain its position that Festival did not incur the entire defeasance cost in 2014.

Because Festival incurred the entire $6,250,155 defeasance cost in 2014 and only collected seven days of rent in 2014, Festival's loan interest costs exceeded the sum of rental payments and the prorated $875,000, and the defeasance costs were properly deducted. Accordingly, the net resale price[82]—the aggregate of the excess loan costs and unchallenged deductions subtracted from the gross sales price—fell below the difference between the 2014 Resale Price Threshold and 2014 Base Resale Distribution Amount.[83]

---

[80] *Id*. at A1801 (Emanuel Cross Exam).

[81] Oral Argument at 48:45–48:53.

[82] $108 Million Gross Sales Price – $12 Million in Proper Deductions = $96 Million Net Resale Price

[83] $100 Million Resale Price Threshold – $3 Million Base Resale Distribution Amount = $97 Million Minimum price for Exit to receive a distribution.

**B. The Court of Chancery's good faith holdings regarding the General Partner and Schurgin are not addressed on appeal.**

Finally, we do not address Festival's contention that Exit's appeal is barred because it failed to challenge the trial court's holding as to the General Partner's and Schurgin's good faith. According to Festival, the trial court suggested that the General Partner's subjective good faith conduct inherently barred any breach of contract claim against the partnership itself.[84] Because we hold that Festival properly deducted the defeasance costs under Subsection (f) and Exit therefore is not entitled to its Special Limited Partner Portion, we do not reach this argument.

## IV. CONCLUSION

For the reasons set forth above, we AFFIRM the judgments of the Court of Chancery set forth in its July 17, 2023 Post-Trial Memorandum Opinion and in its August 4, 2023 Final Order and Judgment.

---

[84] "Given Exit's failure of proof [as to the General Partner and Schurgin's bad faith]—and the LPA's broadly enabling provisions animating the General Partner's discretion to take deductions and exclusive authority to manage the Partnership—I likely could stop my analysis here." *Exit Strategy, LLC.,* 2023 WL 4571932, at *10.

21