**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

BONNIE W. DAVID
VICE CHANCELLOR

COURT OF CHANCERY COURTHOUSE
34 THE CIRCLE
GEORGETOWN, DE 19947

Date Submitted: February 20, 2025
Date Decided: March 10, 2025

Sean J. Bellew, Esquire
Bellew LLC
2961 Centerville Road, Suite 302
Wilmington, DE 19808

William M. Lafferty, Esquire
Lauren K. Neal, Esquire
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street
Wilmington, DE 19801

RE:  *Pimpaktra Rust v. Vina Elise Rust, et al.*,
C.A. No. 2020-0762-BWD

Dear Counsel:

On April 27, 2023, Vice Chancellor Glasscock issued a memorandum opinion finding that, following a January 2022 mediation in a related lawsuit, plaintiff Pimpaktra Rust ("Pim") and defendants Vina Rust ("Vina") and Chakdhari Rust ("Anissa") entered into an enforceable memorandum of settlement ("MOS") resolving "all issues" between the parties. Later, on July 9, 2024, the Court issued a supplemental ruling that interpreted, and addressed certain non-material terms in, the MOS. The Court then invited the parties to identify any remaining issues in dispute. After a February 20, 2025 hearing, two issues remain for adjudication: (1) whether the MOS addresses ownership of real property located in North

Carolina, which the parties refer to as "Grimshawes," and (2) whether certain items constitute "tangible personal property" under the MOS.

I.     BACKGROUND

As detailed in Vice Chancellor Glasscock's April 27, 2023 memorandum opinion (the "Memorandum Opinion"), Pim, Vina, and Anissa are the daughters of the late Richard Rust ("Richard"). *Rust v. Rust*, 2023 WL 3120545, at *1 (Del. Ch. Apr. 27, 2023) [hereinafter *Rust I*].[1]  On July 10, 1953, Richard's brother, Philip Rust ("Philip"), created a revocable trust under a trust agreement (as amended, the "Trust Agreement"),[2] which he funded with real property and other valuables. *Id.* at *1; Am. Compl. ¶ 45.  Philip died on October 25, 2010, and the trust was divided into shares for Philip's three brothers, including Richard (the "Trust").  Am. Compl. ¶¶ 52, 75.  The Trust Agreement provided that, unless Richard directed otherwise, upon his death, Pim, Vina, and Anissa were to receive the Trust property in equal shares. *Rust I*, at *1.

---

[1] Interested readers should consult the Memorandum Opinion for additional background. Like the Memorandum Opinion, this letter opinion refers to the parties by their first names for clarity.  No disrespect or familiarity is intended.

[2] The Trust Agreement was amended by Supplemental Trust Agreements dated December 12, 1956, November 6, 1964, May 1, 1967, April 16, 1970, and July 25, 1972, and amended and restated by Supplemental Trust Agreements dated May 16, 1984 and August 17, 1994. Verified Am. and Supplemented Compl. [hereinafter Am. Compl.] ¶ 45, Dkt. 223.

On September 29, 2011, attorneys from the law firm Ivins, Phillips & Barker, acting on behalf of Philip's estate, formed Goodenow LLC ("Goodenow" or the "LLC"), a Delaware limited liability company. Am. Compl. ¶ 64. Wilmington Trust Company ("Wilmington Trust"), which served as the Trust's trustee, transferred the Trust's real property to Goodenow and was designated the LLC's sole member, with Richard serving as Goodenow's manager. *Rust I*, at *1; Am. Compl. ¶¶ 122–24.

Richard passed away on September 23, 2019. *Rust I*, at *1. Thereafter, a dispute arose between Pim, Vina, and Anissa as to whether they were to receive direct interests in the real estate held in Goodenow or membership interests in the LLC. *Id.* at *2. On September 4, 2020, Pim initiated this action, seeking, among other things, an order dissolving Goodenow and distributing the real property held in Goodenow to Pim, Vina, and Anissa. *Id.*

Pim, Vina, and Anissa are or were also parties to litigation in other jurisdictions, including North Carolina. *Id.* On January 4, 2022, they participated in a mediation in connection with a North Carolina lawsuit, during which they entered into the MOS. *Id.*; *see also* Am. Countercls. Against Pimpaktra A. Rust, Ex. 1 [hereinafter MOS], Dkt. 109.

The MOS states that "[t]he Parties agree that all issues between them are resolved on the following terms." MOS at 1. Among those terms, the parties agreed

that "[a]ll real property not specifically conveyed to Pim Rust in this [MOS] shall be conveyed in equal shares to Vina Rust and Anissa Rust." *Id.* ¶ 7. The parties also agreed that that they would "cooperate in good faith towards an expeditious resolution" of litigation in which Richard's surviving spouse, Amy Chase, claimed a marital trust over Grimshawes (the "Marital Trust Litigation"). *Id.* ¶ 12. The parties further agreed to the "preservation of trust assets for the mutual benefit of all the sisters and to execute such documents as are necessary to accomplish any settlement of that litigation." *Id.*

The parties also agreed that Pim would receive certain "tangible personal property"—namely, "all of the tangible personal property and vehicles located on [certain] New Hampshire properties . . . and three Richard Rust paintings of her choice from the Grimshawes Property"—while Vina and Anissa would "receive all other tangible personal property and vehicles from the Richard Rust Estate" and a precious metals trust (the "Precious Metals Trust"). MOS ¶¶ 4–5.

After executing the MOS, the parties were unable to work out the terms of a final settlement agreement. *Rust I*, at *3–4. On November 21, 2022, Vina and Anissa moved to enforce the MOS. *Id.* at *4. On April 27, 2023, Vice Chancellor Glasscock issued the Memorandum Opinion, which concluded that, "[b]ased on the plain language of the MOS, it is enforceable. The parties explicitly agreed that they

had settled all issues." *Id.* at *9. The Court instructed that "[t]he non-material issues remaining are best addressed by the parties by negotiation or mediation[,]" but "[i]f that is unavailing, non-material terms may be supplied by this Court." *Id.*

On October 13, 2023, Vina and Anissa filed a second motion to enforce the MOS, requesting that the Court interpret, and supply certain non-material terms to effectuate, the MOS. *See* The Rust Defs.' Updated Further Mot. to Enforce the Settlement, Dkt. 179. On July 9, 2024, Vice Chancellor Glasscock issued an oral ruling (the "Bench Ruling"), interpreting and supplying certain non-material terms to the MOS, "generally grant[ing] [D]efendants' motion to further enforce the settlement, together with the terms [] supplied [in the Bench Ruling]." Tr. of 7-9-2024 Tel. Rulings of the Ct. on Defs.' Mot. to Enforce the Settlement Agreement [hereinafter *Rust II*] at 19:19–22, Dkt. 217.

Among other issues, the Bench Ruling determined that the MOS resolves ownership of real property in Hartwell, Georgia—which the parties refer to as the "Hartwell House"—along with its contents. *Id.* at 17:14–18:9. In so finding, the Court explained that ownership of the Hartwell House "w[as] at issue prior to the settlement," and "[t]he [MOS] provides that all property not specifically conveyed

to [Pim] would be conveyed in equal shares to [Vina and Anissa]."[3]  *Id.* at 17:17–21.  "Since the Hartwell House was not specifically conveyed to [Pim] pursuant to the [MOS], it follows that the Rust defendants received ownership of the Hartwell House."  *Id.* at 17:22–18:1.

The Bench Ruling also found that "tangible property contained in each real estate property should be allocated according to which party receives the real estate property unless, with respect to such property, the [MOS] provides otherwise."  *Id.* at 18:2–6.

The Bench Ruling invited the parties to identify any remaining issues.  *Id.* at 19:13–18.  The parties filed letters purporting to identify outstanding issues on September 5 and 6, 2024.  Dkts. 229–30.  This action was reassigned to me on January 8, 2025, and the Court held a hearing on the purported outstanding issues on February 20.  Dkts. 238, 246.

---

[3] On September 11, 2020, Pim notified Vina and Anissa that she intended to seek partition of the Hartwell House and another property.  *See* Aff. of Vina Elise Rust in Supp. of the Rust Defs.' Further Mot. to Enforce the Settlement [hereinafter Vina Aff.] ¶ 3, Dkt. 201; Vina Aff., Ex. 1.  Thereafter, Pim made several settlement proposals under which Vina and Anissa would receive all interests in those properties.  Vina Aff. ¶ 4; Vina Aff., Exs. 2–3, 5. The Bench Ruling concluded that the Hartwell House "w[as] at issue prior to the settlement" and the MOS resolved such issues. *Rust II*, at 17:17–21.

## II. ANALYSIS

The February 20 hearing narrowed the issues for resolution to two: (1) whether the MOS addresses ownership of Grimshawes, and (2) whether certain items constitute "tangible personal property" under the MOS.

Both open issues require the Court to interpret the MOS.[4] Under Delaware law, "[c]ontract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language." *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997). Only "when there is uncertainty in the meaning and application of contract language, the reviewing court must consider the evidence offered in order to arrive at a proper interpretation of contractual terms." *Id.*

### A. Grimshawes

Prior to Philip's death, Philip and Richard owned the property known as "Grimshawes" as tenants in common, each with a 50% undivided interest. Answer to Verified Am. and Supplemented Compl. ¶ 56, Dkt. 51. Upon Philip's death, his interest in Grimshawes was contributed to Goodenow, such that Richard and

---

[4] The remaining issues do not require the Court to supplement the MOS with non-material terms, but to interpret the plain language of the MOS.

Goodenow became tenants in common, each with a 50% undivided interest. *Id.* The parties agree on this much. But they disagree on whether the interest in Grimshawes now owned by Richard's estate is subject to the MOS.[5]

Pim argues that Richard's estate's interest in Grimshawes was not at "issue" prior to the MOS because it was not the subject of litigation between Pim, Vina, and Anissa. *See* Dkt. 190 at 52 (arguing that "Grimshawes was NEVER part of the partition litigation in North Carolina, and therefore not part of any litigation being settled").

Vina and Anissa argue that Richard's estate's interest in Grimshawes, like the Hartwell House, *was* an "issue" among the parties that was resolved through the MOS. Although Grimshawes was not the subject of litigation between the sisters, Plaintiffs point to a November 2020 email in which Pim's lawyer proposed a split of estate assets where Pim would "walk[] away" from both the Hartwell House *and* Grimshawes. Dkt. 201, Ex. 2. And in a December 2021 email, Pim's lawyer told the mediator that Grimshawes "should be discussed along with the other NC properties" because, although "[t]he Grimshawes property [wa]s not . . . part of the

---

[5] The parties do not seriously dispute that Goodenow's interest in Grimshawes is subject to the MOS. All real property held by Goodenow, including the 50% interest in Grimshawes, was at issue in this litigation when the MOS was signed.

partition proceeding, . . . each of the sisters own[ed] a fractional interest, along with Goodenow." Vina Aff., Ex. 4 at 3.

Vina and Anissa have the better argument. The parties could have limited the MOS to resolving claims asserted in litigation. But they did not. Instead, the unambiguous language of the MOS resolves "all issues" between the parties. How to move forward with a property jointly owned by sisters who could not get along presented an "issue" that the parties agreed to mediate along with claims pending in litigation. The plain terms of the MOS resolve ownership of Grimshawes.[6]

---

[6] Pim notes that the MOS requires the parties to cooperate towards resolution of the Marital Trust Litigation, and provides for "preservation of trust assets for the mutual benefit of all the sisters." She interprets the parties' agreement to preserve assets for the "mutual benefit" of the sisters to exclude Grimshawes from the MOS. Dkt. 207, Attach. to Ltr. at 3–4; *see also* Ltr. dated Sept. 5, 2024 to the Hon. Sam Glasscock at 6–7, Dkt. 229 ("Pim seeks clarification that the Court's ruling regarding 'all real property not specifically conveyed to Pim Rust' does not refer to . . . Trust property preserved for 'the mutual benefit of each sister' under the MOS (¶12), including real property acquired by the Marital Trust as determined by the North Carolina Court on 12/1/2023."). That is not a reasonable interpretation of the plain language of the MOS. "Mutual benefit" implies that each party to the bargain benefits, but it does not follow that all parties benefit equally or in the same manner. Preserving the assets in the marital trust benefits Vina and Anissa because the interests in Grimshawes are allocated to them, but Pim also benefits because she is to receive three paintings of her choosing located at Grimshawes.

Pim also argues that, because Grimshawes is subject to a marital trust, the parties could not have agreed to the transfer of that property in the MOS. That argument fails because Pim offers no explanation for why she could not renounce her remainder interest in the property.

B.      **Tangible Personal Property**

The MOS states that Pim will receive "all of the tangible personal property and vehicles located on [certain] New Hampshire properties . . . and three Richard Rust paintings of her choice from the Grimshawes Property[,]" while Vina and Anissa will "receive all other tangible personal property and vehicles from the Richard Rust Estate and the Precious Metals Trust."  MOS ¶¶ 4–5.  The parties dispute whether certain items—tractors and maintenance equipment, harvested timber and lumber, and autographs, firearms, and artwork—constitute "tangible personal property" under the MOS.

The MOS does not define "tangible personal property."  But "[a] term is not ambiguous simply because it is not defined." *Sassano v. CIBC World Mkts. Corp.*, 948 A.2d 453, 468 n.86 (Del. Ch. 2008).  Rather, "[u]nder well-settled case law, Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract." *Thermo Fisher Scientific PSG Corp. v. Arranta Bio MA, LLC*, 2023 WL 2771509, at *17 (Del. Ch. Apr. 4, 2023) (quoting *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006)).  Black's Law Dictionary defines "personal property" as "[a]ny movable or intangible thing that is subject to ownership and not classified as real property." *Personal Property*, *Black's Law Dictionary* (12th ed. 2024).  "Tangible personal property" is

"[c]orporeal personal property of any kind; personal property that can be seen, weighed, measured, felt, touched, or in any other way perceived by the senses, examples being furniture, cooking utensils, and books." *Tangible Personal Property*, *Black's Law Dictionary* (12th ed. 2024). Under the ordinary meaning of the phrase, each of the items in dispute would constitute "tangible personal property."

Although the MOS appears unambiguous, the parties have stipulated that the definition of "tangible personal property" in Richard's will and the Precious Metals Trust should inform the Court's interpretation of the MOS. Those documents state:

> The term "tangible personal property" means personal property such as furniture, furnishings, clothing, jewelry, household items, and the like, but *does not include property primarily held for investment purposes*, nor does it include any property *held for use in a trade or business*, ordinary currency, and cash or bullion.

Am. Compl., Ex. E at Article X(D) (emphasis added). *See* Dkt. 190 at 45–46 (Pim arguing that "[t]his definition applies to the MOS's use of the term 'tangible personal property' as that would be the reasonable expectation of the parties in entering the MOS"); Dkt. 208, Ex. B at 103 (Vina and Anissa generally agreeing "that 'property held primarily for investment purposes, [or] property held for use in trade or business, [or] bullion' falls outside the definition of TPP, and thus is not covered by the MOS").

Pim argues that tractors and maintenance equipment are not "tangible personal property" because they are "held for use in trade or business," and that timber and lumber, autographs, flutes, antique firearms, and original artwork in the Hartwell House and "marital residence" are not "tangible personal property" because they are "held for investment purposes."[7] Tr. of 2-20-2025 Oral Args. On Defs.' Mot. to Dismiss at 115:9–118:9, Dkt. 246.

Vina and Anissa respond that a July 15, 2020 "Agreement by Trustees of Revocable Trust Agreement of January 5, 2009 of Richard C. Rust" (the "2020 Trustee Agreement") makes clear that certain of those items are tangible personal property by listing them as such. Namely, the 2020 Trustee Agreement lists the following items as tangible personal property:

1. The coin collection Richard C. Rust inherited, located in Thomasville, Georgia at the time of his death.

---

[7] Pim's argument here is difficult to track. She originally argued in a January 10, 2024 letter that a "Musical Instruments Collection" and "200 + firearm Collection" were "held as investment" and an "Art collection & Originals" were "use[d] for trade of [sic] biz." Dkt. 207, Ex. C. These items seem to correspond to the disputed items identified in Pim's September 5, 2025 letter, under the category "Stamps and Covers." Dkt. 229, Ex. B at 2. But in her September 5 letter, Pim argues that these items were not re-assigned under the MOS because such items are governed by the provision in the MOS requiring preservation of marital trust assets for the "mutual benefit" of each sister. *Id.* Yet at the February 20, 2025 oral argument, Pim reverted to her initial argument that these items are not tangible personal property because they were held for investment purposes. Tr. of 2-20-2025 Oral Arg. on Defs.' Mot. to Dismiss at 115:9–118:9, Dkt. 246; *but see id.* at 97:15–98:7 (arguing that the preservation of property required by paragraph 12 of the MOS means such property is "not within the transfer of gives and gets of the real estate or the TPP").

2. Richard C. Rust's personal and inherited collections of stamps, autographs and letters.

3. All Richard C Rust's personal and inherited furnishings, books, artwork and other tangible personal property located at Winnstead in Thomasville, Georgia.

4. All the maintenance equipment located in New Hampshire, North Carolina and Georgia.

5. Richard C. Rust's personal and inherited flute collection.

6. Richard C. Rust's inherited firearms collection.

7. Richard C. Rust's timber grown, harvested, processed and stored in Winnstead at time of death.

8. All Richard C. Rust's inherited furnishings and other tangible personal property located in New Hampshire.

9. Coins located in North Carolina at the time of Richard C. Rust's death.

Dkt. 230, Ex. C.

Pim offers no principled reason for why the Court should consider Richard's will and the Precious Metals Trust to determine which items constitute tangible personal property, but must disregard the 2020 Trustee Agreement. If the Court looks only to the unambiguous terms of the MOS, the disputed items are all tangible

personal property.  If the Court looks to past agreements, the specific language in the 2020 Trustee Agreement trumps the more general definition in Richard's will and the Precious Metals Trust.  Either way, the result is the same—the disputed items are tangible personal property under the MOS.

## III.    CONCLUSION

The MOS resolves ownership of Grimshawes, and the disputed items are tangible personal property.  In light of this guidance, the parties should meet and confer on a proposed form of order to bring this action to a close.

Sincerely,

*/s/ Bonnie W. David*

Bonnie W. David
Vice Chancellor

cc:    All counsel of record (by File & ServeXpress)